UNITED STATES, Appellee

v.

Shawn R. Hull, Staff Sergeant
U.S. Air Force, Appellant

No. 11-0131

Crim. App. No. 37470

United States Court of Appeals for the Armed Forces

Argued April 21, 2011

Decided June 10, 2011

EFFRON, C.J., delivered the opinion of the Court, in which
BAKER, ERDMANN, STUCKY, and RYAN, JJ., joined.


Counsel


For Appellant:  Major Bryan A. Bonner (argued); Lieutenant
Colonel Gail E. Crawford and Major Darrin K. Johns (on brief);
Colonel Eric N. Eklund.


For Appellee:  Captain Joseph J. Kubler (argued); Colonel Don M.
Christensen and Gerald R. Bruce, Esq. (on brief).


Military Judge:  Ronald A. Gregory


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

United States v. Hull, No. 11-0131/AF

Chief Judge EFFRON delivered the opinion of the Court.

A general court-martial composed of a military judge sitting alone, convicted Appellant, pursuant to mixed pleas, of dereliction of duty (providing alcohol to a minor), rape, and adultery, in violation of Articles 92, 120, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 920, 934 (2006).  The sentence adjudged by the court-martial and approved by the convening authority included a dishonorable discharge, confinement for three years, and reduction to E-1.  The United States Air Force Court of Criminal Appeals affirmed.  United States v. Hull, No. ACM 37470, 2010 CCA LEXIS 342, at *7, 2010 WL 4069060, at *3 (A.F. Ct. Crim. App. Sept. 15, 2010) (unpublished).

On Appellant's petition, we granted review of the following issue:

> WHETHER THE STAFF JUDGE ADVOCATE ERRED IN
> ADVISING THE CONVENING AUTHORITY, PURSUANT
> TO RULE FOR COURTS-MARTIAL (R.C.M.) 1106,
> THAT NO NEW TRIAL WAS WARRANTED, AND WHETHER
> THE CONVENING AUTHORITY ERRED BY FAILING TO
> ORDER A NEW TRIAL DESPITE THE STAFF JUDGE
> ADVOCATE'S ACKNOWLEDGEMENT THAT APPELLANT
> HAD PRESENTED NEW EVIDENCE THAT FELL WITHIN
> THE PARAMETERS OF R.C.M. 1210.

For the reasons set forth below, we conclude that the staff judge advocate (SJA) did not err in his advice to the convening authority, and that the convening authority did not abuse her discretion in denying Appellant's request for a new trial.

2

<u>United States v. Hull</u>, No. 11-0131/AF

## I.  THE NEW TRIAL REQUEST

Subsequent to the adjudication of findings and sentence, but prior to the convening authority's action, information came to the attention of defense counsel regarding the credibility of a key prosecution witness.  Based upon this information, the post-trial submissions by the defense to the convening authority under Rule for Court-Martial (R.C.M.) 1105 included a request for a rehearing pursuant to R.C.M. 1107(c)(2)(B).

The convening authority's decision to deny the defense request provides the focus for the present appeal.  To place the appellate consideration of these matters in context, Part A describes the pertinent testimony at trial.  Part B describes the post-trial proceedings, including the defense request for a new trial, the recommendation by the SJA, and the action by the convening authority.

## A.  TRIAL PROCEEDINGS

### 1.  <u>The prosecution's primary witnesses</u>

The prosecution relied primarily on three witnesses to establish the essential facts on the underlying charges: Officer Ryan Freeman, a civilian law enforcement official who investigated the allegations in the immediate aftermath of the alleged rape; a neighbor, Daniel Yarbrough; and the complainant, TB.

Officer Freeman testified that on the night of the incident, he responded to a call indicating that a rape had taken place at an apartment complex near Hill Air Force Base, Utah.  Officer Freeman stated that he obtained statements from TB and her friend, Jessica Hutchison.  Over defense objection, the military judge permitted Officer Freeman to relate details of the statements provided to him by TB and Ms. Hutchison on the theory that the statements constituted excited utterances under Military Rule of Evidence 803(2).

According to Officer Freeman, Ms. Hutchison related the following information in her verbal statement.  On the night of the incident, she had spent the evening in the apartment with TB and Appellant.  TB told Ms. Hutchison that her boyfriend was coming over to pick her up, and TB went into her bedroom to change clothes.  Ms. Hutchison subsequently heard some noises coming from TB's room.  When she entered TB's bedroom to investigate, she saw TB with her face on the bed, repeating the word "No."  Appellant, who was naked from the waist down, was positioned on top of TB.  Upon this discovery, Ms. Hutchison ran to the apartment of her neighbor in order to call the police. Ms. Hutchison told Officer Freeman that Appellant had "possibly raped" TB.  In a written statement provided to Officer Freeman, Ms. Hutchison added that when she walked into TB's room to

4

investigate the noises, TB "was saying No No No" and Appellant "had her pinned down behind her raping her."

TB's neighbor, Daniel Yarbrough, testified that at approximately 11:00 p.m., he heard a woman's voice at his door "screaming hysterically." He described it as a bloodcurdling scream" of "[h]elp me." He opened the door and saw Ms. Hutchison, who was "topless," being followed by Appellant, whose "pants were halfway on, half off." According to Mr. Yarbrough, the two individuals at his door were screaming at each other. After he called 911 to report the altercation, he heard noises coming from TB's apartment "like furniture being bumped around and . . . people struggling, fighting." Subsequently, he entered the apartment, which he described as being in "disarray . . . like people had been messing around in there, fighting around in there." He saw TB, who was crying.

TB provided a similar description of the evening's events. She stated that after entering her bedroom, Appellant proceeded to remove her clothes, push her on the bed, and rape her.

2. The defense at trial

The defense took the position that TB and Appellant had engaged in consensual sexual activity, and that TB had not been truthful in claiming that she had been raped. The defense relied primarily upon the trial testimony of Ms. Hutchison, who had significantly revised her original account of the incident.

5

At the time of the incident, Ms. Hutchison was dating Appellant, had recently given birth to Appellant's child, and had recently moved into TB's apartment where she and her young child lived in TB's living room. In contrast to her initial statement to Officer Freeman, Ms. Hutchison testified at trial that Appellant and TB "had been flirting that night," and that she observed "what was about to be consensual sex" when she entered TB's bedroom.

At trial, Ms. Hutchison indicated that TB may have been motivated to make a rape allegation in response to Ms. Hutchison's reaction upon seeing TB and Appellant in the bedroom. Ms. Hutchison described herself as a person who tends to "overreact." She added that upon discovering Appellant and TB together in the bedroom, she became the angriest that she had "ever been." When she confronted TB after the discovery, Ms. Hutchison "was very mad, very mad, and [she] was like . . . Was that rape?" At this point she described her demeanor as "hostile" towards TB, and testified that she "would have probably hit her or done something violent to her" if TB had informed her that the actions had in fact been consensual. In addition, because she was taller and larger than TB, it "would have been very easy, and I'm sure she knew it, for me to hurt her in some way."

6

In response to questions at trial as to why she had changed her description of the events -- from an initial characterization of rape to her trial testimony of a consensual romantic encounter -- Ms. Hutchison testified that she had initially agreed with TB that a rape had occurred because she was "extremely mad" at Appellant and wanted him "to pay" for cheating on her. She stated that at the time "it was easier to believe that it was rape than that it was totally consensual, because then at that point it would mean that he had more or less betrayed my trust."

The defense also directly attacked TB's credibility at trial. The defense sought to portray TB's description of the alleged rape as lacking consistency from one telling to the next. In that regard, the defense focused on TB's changing descriptions, over time, regarding the timeline of events, the location of her clothing, her positions on the bed, and Appellant's actions.

In response to the defense case, the Government relied primarily upon the evidence obtained on the night of the incident. The Government argued that Ms. Hutchison's initial verbal and written statements, TB's initial verbal and written statements, the testimony of TB's neighbor, and Officer Freeman's description of the evening's events all led to the conclusion that Appellant had raped TB. In addition, the

7

Government argued that Ms. Hutchison's later contrary trial testimony lacked credibility. Specifically, the Government contended that Ms. Hutchison had "a motive to lie" and to protect Appellant because she continued to receive financial assistance from him. In support of this proposition, the Government noted that Appellant currently paid Ms. Hutchison's gas, electric, garbage, sewer, and water bills, and also provided medical care, clothes, and toys for their young child.

B.    POST-TRIAL PROCEEDINGS

1.  The defense request for a new trial

On January 29, 2009, the military judge entered a finding of guilty on the charge that Appellant had raped TB. On March 17, 2009, the SJA served on the defense the SJA's recommendation to the convening authority under R.C.M. 1106, which recommended approval of the findings and sentence.

The area defense counsel submitted a clemency request to the convening authority on April 9, 2009, requesting that the convening authority "set aside AB Hull's conviction" or, in the alternative, "grant a new trial" because of "new evidence that was not available at trial." Counsel attached an unsworn statement signed by Taycee Smith, dated April 8, 2009, which contained the following two paragraphs:

> 1.  I am Taycee Smith, a resident of the State of Utah. I worked at Citibank Financial with [TB] in October of 2008. I

> knew [TB] from work.  I am aware that [TB] claimed to have been raped by SSgt Shawn Hull.  [TB] told me on two occasions that what happened between SSgt Hull and [TB] was not rape.  [TB] stated that everything had been planned and that it was all consensual.
>
> 2.  I was not present with [TB] and SSgt Hull when the alleged rape occurred.  I only know what [TB] told me afterwards.  She did not tell me why she claimed that it was rape, she only told me that it was not rape, that what happened was consensual.

Below her signature, Ms. Smith added the following handwritten note, followed by her initials:  "Conrad Quick heard [TB] say this as well."

The defense submission offered the following background on the development of this information.  According to defense counsel, Ms. Micaela Gonzalez, a defense witness, had informed Ms. Smith that Appellant had been found guilty of raping TB, at which time Ms. Smith told Ms. Gonzalez that TB had described the incident as consensual.  Ms. Gonzalez relayed this information to Ms. Hutchison, who in turn informed the defense on March 23, 2009, more than a month after the conclusion of trial.

Defense counsel contended that the newly discovered evidence warranted relief because there was "no question [that] this evidence could have made a difference" at trial.  According to the defense, the "only evidence that an actual rape occurred was [TB]'s testimony" at trial, and that even "without Ms. Smith's new evidence, there were several problems with [TB]'s

testimony and her recollection of the event." Defense counsel added that TB had "given multiple accounts as to what happened and they have all changed significantly from each other." The defense counsel concluded by contending that with "Miss Smith's new evidence to place [TB]'s testimonial inconsistencies in perspective, it is very likely that AB Hull would not be found guilty at all."

The senior defense counsel submitted a similar request to the convening authority. The senior defense counsel's request asked the convening authority to "set aside the conviction" or, in the alternative, "order a rehearing (i.e., a new trial) pursuant to RCM 1107(c)(2)(B)."

## 2. The Government's inquiry

The Government sought to obtain further details regarding the information from Ms. Smith, but ran into difficulties. When trial counsel attempted to interview Ms. Smith, she proved uncooperative and evasive. Trial counsel made multiple unsuccessful attempts to call Ms. Smith, and left various messages that went unanswered. When he subsequently reached Ms. Smith by phone on April 14, 2009, she agreed to a short in-person interview at her home the next morning. When trial counsel showed up for the meeting the next day, however, Ms. Smith was not present. She did not respond to trial counsel's ensuing phone calls.

On April 17, 2009, trial counsel was able to reach Ms. Smith by phone.  He emphasized the importance of an interview in view of the consequences for SSgt Hull, who was facing a three-year prison term.  She declined to meet with the trial counsel, but agreed to address a few questions during the phone call. When the trial counsel asked Ms. Smith as to whether she had been truthful in her written statement, she said:  "'I don't know how true the statement is.  I didn't believe it.  I didn't believe much of anything that [TB] or Jessica Hutchison said because every day the story changed.'"  When trial counsel asked her to provide contact information for Conrad Quick, the other party mentioned in her statement, she responded:  "'I asked him if he heard [TB] say it and he said he must not have been paying attention at the time.'"  She did not provide trial counsel with any contact information for Mr. Quick.  In a subsequent phone call, she stated that she could not identify the date or location of her conversation with TB, other than noting that it was "at a party in Layton, likely during the month of Oct 08." Ms. Smith also noted that TB had made a similar statement "in a restaurant in Roy, also in Oct 08."

Over the next three days, trial counsel again tried to contact Ms. Smith in an effort to compare Ms. Smith's statement with TB's statements.  Ms. Smith, however, did not return his phone messages.  At that point, trial counsel summarized the

developments in a memorandum entitled: "Attempted Witness Interview: Taycee Smith." After setting forth the details of his efforts to contact Ms. Smith and her brief remarks to him, he concluded:

> Ms. Smith's oral statement that she really didn't believe what [TB] or Ms. Hutchison said, combined with her inability to recall the place or month of the conversation casts significant doubt on the credibility of her written statement. Her refusal to participate in an in-person interview, as well as her repeated failure to return phone calls also weakens the credibility of her written statement.

3. The SJA's addendum

On May 28, 2009, the SJA prepared an addendum to his recommendation to the convening authority under R.C.M. 1106(f)(7). The addendum, which was served on the defense, addressed the defense request for a new trial, the trial counsel's memorandum, and a sworn statement provided by TB on May 14, 2009. In the sworn statement, TB denied that she had ever told Ms. Smith that she had made false allegations against Appellant, adding: "I stand by the statements I made at SSgt Hull's trial."

The SJA's addendum described the discovery of the new evidence by the defense, the difficulties encountered by trial counsel in conducting the subsequent inquiry, the unwillingness of Ms. Smith to cooperate, and the nature of the information

provided by Ms. Smith.  Based on these considerations, the SJA

advised the convening authority that "the credibility of her

written statement should be considered by you."  The SJA also

noted that TB had "remained completely cooperative, as well as

firm and consistent in her statements and affidavit, contrasting

the demeanor of the alleged new witness, Ms. Smith."

The SJA informed the convening authority that "Rule for

Courts-Martial 1210(f)(1)(2)(3) states that a new trial may be

granted only on grounds of newly discovered evidence or fraud in

the court-martial.  The rule further provides that:

> a new trial shall not be granted on the
> grounds of newly discovered evidence unless
> the petition shows that:  the evidence was
> discovered after the trial; the evidence is
> not such that it would have been discovered
> by the petitioner at the time of trial in
> the exercise of due diligence; and the newly
> discovered evidence, if considered by a
> court-martial in the light of all other
> pertinent evidence, would probably produce a
> substantially more favorable result for the
> accused.

Based on this standard and his analysis of the newly

discovered evidence, the SJA informed the convening

authority:

> The statements by the new witness Taycee
> Smith do fall within the parameters of RCM
> 1210.  However, the unwillingness of this
> witness to make herself available to be
> interviewed, the potential credibility
> issues of Ms. Smith . . . and the fact that
> the court members had substantial
> opportunity to assess the victim's

> credibility, all give compelling reasons to
> uphold the conviction and finding of the
> Court.

In that context, the SJA recommended against granting a new hearing.

4.  The defense response to the SJA's addendum

In defense counsel's June 9, 2009, response to the SJA's addendum, the defense reiterated its request that the convening authority either set aside the findings or order a new trial. Defense counsel contended that it "is clear that [Ms. Smith] wants no part of this process." The defense added that this circumstance "does not mean that [Ms. Smith] is in any way untruthful in what she told both me and the government representative," as she "has absolutely no reason to lie and has in fact told the same facts to both sides." Counsel further argued that the information Ms. Smith "possesses is vital for finding the truth," and that one "of the benefits of a new trial, is that Ms. Smith can be compelled to cooperate." According to the defense, "[i]n the trial process, she can be made to appear to testify or even to provide a deposition. No such power to compel her cooperation exists in these post trial proceedings."

5.  The second addendum and the convening authority's action

On June 10, 2009, the SJA provided the convening authority with a further addendum, stating that he "still find[s] no

14

compelling reason" to set aside Appellant's conviction or order a rehearing.  On June 11, 2009, the convening authority took action, approving Appellant's adjudged sentence, thereby denying his request to set aside the conviction or grant a new trial.


## II.  DISCUSSION

### A.  THE SCOPE OF POST-TRIAL ACTION BY A CONVENING AUTHORITY

A convening authority is authorized "to modify the findings and sentence of a court-martial" as "a matter of command prerogative involving the sole discretion of the convening authority."  Article 60(c)(1), UCMJ, 10 U.S.C. § 860(c)(1); see R.C.M. 1107(b)(1).  When taking action on the results of trial, the convening authority may order a rehearing "as to some or all offenses of which findings of guilty were entered and the sentence, or as to sentence only."  R.C.M. 1107(e)(1)(A).

In practical terms, a rehearing in full ordered by a convening authority under Article 60 involves the same trial-stage procedures as a new trial ordered by the Judge Advocate General or appellate courts under Article 73, UCMJ, 10 U.S.C. § 873.  See R.C.M. 810.  The convening authority's power to order a rehearing under Article 60, however, differs in a number of significant respects from the authority to order a new trial under Article 73 by the Judge Advocate General and appellate courts.  A petition under Article 73 may be submitted at "any

time within two years after approval by the convening authority of a court-martial sentence . . . on the grounds of newly discovered evidence or fraud on the court," and is subject to the standards and criteria set forth in R.C.M. 1210. By contrast, the convening authority, who may order a full or partial rehearing when taking post-trial action on the case as a matter of command prerogative, is not limited by the standards and criteria of Article 73 and R.C.M. 1210. See Article 60, UCMJ; R.C.M. 1107.

In view of the potential impact of newly discovered evidence on appellate consideration of a case, the SJA or the convening authority may find it useful to apply Article 73 and R.C.M. 1210 criteria as a means of addressing such information early in the post-trial process. The convening authority, however, is not obligated to apply those criteria in exercising command prerogative powers under Article 60.

In the course of considering action under Article 60 in the face of newly discovered evidence, the convening authority has options other than considering a rehearing on the findings and sentence. The convening authority also has the power to address post-trial developments by returning the record for a limited post-trial hearing before the military judge under Article 39(a), UCMJ, 10 U.S.C. § 839(a). See R.C.M. 1102(b)(2) (authorizing a hearing "for the purpose of inquiring into, and,

16

when appropriate, resolving any matter that arises after trial and that substantially affects the legal sufficiency of any findings of guilty or the sentence").

In the present case, the defense asked the convening authority to either dismiss the charges or order a rehearing in full. The defense did not ask the convening authority to return the case to the military judge for a hearing under Article 39(a) to resolve any of the post-trial issues under R.C.M. 1102(b)(2). On appeal, the defense contends: (1) that the SJA provided the convening authority with erroneous legal advice when he recommended that the convening authority not order a new trial; and (2) that the convening authority erred in not ordering a new trial after the SJA noted that the defense request "f[ell] within the parameters" of the new trial standards under R.C.M. 1210.

B. THE STAFF JUDGE ADVOCATE'S ADVICE AND THE CONVENING AUTHORITY'S ACTION

Prior to acting on the results of a general court-martial and certain special courts-martial, the convening authority must consider the SJA's recommendation prepared under R.C.M. 1106. See Article 60(d), UCMJ. Although the SJA "is not required to examine the record for legal errors," the SJA must state whether "corrective action on the findings or sentence should be taken when an allegation of legal error is raised in matters submitted

17

[by the defense] under R.C.M. 1105 or when otherwise deemed appropriate by the staff judge advocate." R.C.M. 1106 (d)(4). The SJA's response to legal errors raised by the defense "may consist of a statement of agreement or disagreement with the matter raised by the accused." Id. "An analysis or rationale for the staff judge advocate's statement, if any, concerning legal errors, is not required." Id. Although not required, an analysis of legal issues raised by the defense may facilitate resolution of legal issues at the trial level, thereby conserving appellate resources. See United States v. Taylor, 60 M.J. 190, 195 (C.A.A.F. 2004) (noting that "[b]ecause the defense submission included allegations of legal error, the staff judge advocate's advice to the convening authority was particularly important").

In the present case, the defense submitted a post-trial request for a rehearing invoking the new trial criteria of R.C.M. 1210. The SJA proceeded to address the defense request on the terms raised by the defense. In that context, it was not inappropriate for the SJA to apply the criteria set forth in R.C.M. 1210 by analogy to the rehearing request. Cf. United States v. Scaff, 29 M.J. 60, 65-66 (C.M.A. 1989) (noting the propriety of utilizing R.C.M. 1210 criteria in the post-trial setting while examining newly discovered evidence in the context of an Article 39(a) session). Although the SJA might have added

further information concerning the distinction between a "new trial" ordered during appellate review under Article 73, and a "rehearing" ordered by a convening authority under Article 60, omission of that information did not constitute error in the context of the defense request in the present case. In that regard, we note that the defense, which has not raised that distinction in the present appeal, has persisted in treating the present case as involving the criteria for a new trial under Article 73 and R.C.M. 1210.

In his advice to the convening authority, the SJA focused primarily upon the vague nature of Ms. Smith's unsworn oral and written statements, as well as her failure to cooperate when the Government attempted to further investigate the matter. The SJA concluded that:

> the unwillingness of [Ms. Smith] to make herself available to be interviewed, the potential credibility issues of Ms. Smith . . . , and the fact that the court members had substantial opportunity to assess the victim's credibility, all give compelling reasons to uphold the conviction and finding of the Court.

In the defense post-trial submissions, and on appeal, the defense contends that any difficulty in obtaining information regarding the details of Ms. Smith's account or the credibility of her statements could

19

have been resolved by setting aside the findings and ordering a new trial, which would then have the power to compel her attendance by subpoena.

This Court has emphasized that "requests for a new trial, and thus rehearings and reopenings of trial proceedings, are generally disfavored," and are "granted only if a manifest injustice would result absent a new trial, rehearing, or reopening based on proffered newly discovered evidence." United States v. Williams, 37 M.J. 352, 356 (C.M.A. 1993). The defense has not contested the validity of the trial counsel's memorandum regarding the difficulties in obtaining information from Ms. Smith, nor has the defense presented a sworn statement from Ms. Smith or any corroborating evidence. Most important, the defense -- having been informed of the SJA's negative view of the defense request due to the vagueness of the information and related matters -- did not ask the convening authority to order a post-trial Article 39(a) session for the purpose of compelling Ms. Smith or any other witnesses to appear and give sworn testimony. In the absence of a defense request for a post-trial Article 39(a) session, and in light of the vague nature of the unsworn information provided by the defense, the SJA was not obligated to inform the convening authority as to the possibility of ordering such a hearing. See United States v.

Ruiz, 49 M.J. 340, 348 (C.A.A.F. 1998); United States v. Begnaud, 848 F.2d 111, 113 (8th Cir. 1988).

In addition to contending that the SJA erred, the defense also contends that the convening authority erred by not relying upon that portion of the SJA's advice which noted that the newly discovered evidence "fall[s] within the parameters of RCM 1210." Although the phrase highlighted by the defense could be viewed as favorable to Appellant's position on appeal, it would be inappropriate to focus on this phrase in isolation without considering the remainder of the SJA's advice in context. When viewing the SJA's recommendation in its entirety, it is apparent that the SJA did not take the position that a new trial was required under the criteria set forth in R.C.M. 1210. Instead, the recommendation makes clear that the SJA was advising the convening authority that the defense evidence could be considered under the criteria of R.C.M. 1210, and that the nature of the evidence did not warrant a new trial under those criteria.

Under the circumstances of this case, particularly the nature of the defense's newly discovered evidence and the absence of a defense request for a post-trial Article 39(a) session, the SJA did not misadvise the convening authority. Likewise, the convening authority did not abuse her discretion in approving the findings and sentence.

### III.  CONCLUSION

The decision of the United States Air Force Court of Criminal Appeals is affirmed.