# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39640**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Anthony W. HARRIS, Jr.**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 2 September 2020

————————————

*Military Judge:* Andrew R. Norton (arraignment); Joseph S. Imburgia.

*Approved sentence:* Dishonorable discharge, confinement for 7 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 19 October 2018 by GCM convened at Osan Air Base, Republic of Korea.

*For Appellant:* Major Mark J. Schwartz, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Captain Kelsey B. Shust, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Chief Judge J. JOHNSON delivered the opinion of the court, in which Senior Judge POSCH and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

J. JOHNSON, Chief Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of sexual assault by causing bodily

harm and one specification of abusive sexual contact, both in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] The court members sentenced Appellant to a dishonorable discharge, confinement for seven years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence.

Appellant raises four issues on appeal: (1) whether the evidence is legally and factually sufficient to support Appellant's conviction for sexual assault against Senior Airman (SrA) LS; (2) whether the evidence is legally and factually sufficient to support Appellant's conviction for abusive sexual contact[3] against Airman First Class (A1C) DG; (3) whether the military judge erred by failing to instruct the court members that SrA LS was capable of consenting to the alleged sexual act; and (4) whether the convening authority was constitutionally required to direct a post-trial session or a new trial in light of SrA LS's testimony having materially changed months after Appellant was convicted.[4] In addition, we consider whether Appellant is entitled to relief for facially unreasonable appellate delay. We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

In the summer of 2017, Appellant was stationed at Osan Air Base (AB), Republic of Korea, where he lived in a dormitory designated for senior noncommissioned officers. Appellant often visited a nearby outdoor designated smoking area known as the "smoke pit," where he would socialize with other Airmen from various dormitories.

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] The court members found Appellant not guilty of one specification of abusive sexual contact in violation of Article 120, UCMJ.

[3] Both Appellant's brief and the Government's answer refer to "Appellant's conviction for *sexually assaulting* A1C DG" (emphasis added). However, Appellant was not convicted for the offense of sexual assault against A1C DG; he was convicted for the offense of abusive sexual contact by "touch[ing] directly the genitalia of [A1C DG] when [Appellant] knew that [A1C DG] was asleep, with an intent to gratify his sexual desire." Accordingly, we have analyzed Appellant's appeal as a challenge to the legal and factual sufficiency of his conviction for abusive sexual contact against A1C DG.

[4] Appellant personally raises issue (4) and some aspects of issue (1) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

## A. A1C DG

A1C DG was also stationed at Osan AB in the summer of 2017 and lived in a dormitory for junior Airmen. A1C DG first met Appellant at an off-base bar, where he had a casual conversation with Appellant and some "lady friends" who were with Appellant that evening.

A1C DG encountered Appellant again on the evening of 2 August 2017 at the smoke pit. Appellant and A1C DG conversed casually for a while before A1C DG asked Appellant if he could invite one of Appellant's "lady friends" that A1C DG had met before to join them at the smoke pit. The particular friend A1C DG had in mind did not respond to Appellant's texts, but another female friend of Appellant's, Technical Sergeant (TSgt) VC, did join them. Three male individuals later joined the group and brought beer with them, at which point A1C DG began consuming alcohol.

Eventually Appellant invited the group to his dormitory room to listen to music and drink soju, a Korean alcohol. In Appellant's room, A1C DG initially spent most of his time talking to TSgt VC, engaging in what he later characterized as "light flirting." A1C DG also began drinking soju provided to him by Appellant. After some period of time, the group returned to the smoke pit with the exception of TSgt VC, who lay down on Appellant's sofa to rest. After more drinking and socializing, Appellant, A1C DG, and one other male individual Appellant did not know, SrA MW, returned to Appellant's quarters, where TSgt VC still was.

A1C DG later testified that he remembered greeting TSgt VC when he re-entered Appellant's quarters, Appellant and SrA MW walked around A1C DG and into Appellant's bedroom and closed the door, and then there was a gap in A1C DG's memory. A1C DG's next memory is of being "awoken" when SrA MW rapidly exited the bedroom and Appellant's quarters, "walk[ing] out very fast." A1C DG then looked over at TSgt VC, lay his head back down, and experienced another gap in his memory. A1C DG's next memory was of being in an elevator with TSgt VC, who "looked very disgruntled and upset." A1C DG's next memory after that was waking up on the morning of 3 August 2017 in his dormitory room when TSgt VC and TSgt DM, a male friend of both Appellant and TSgt VC and an acting first sergeant at the time, knocked at his door.

TSgt VC testified at Appellant's court-martial and filled in many of the gaps in A1C DG's testimony. TSgt VC had been sleeping but awoke when Appellant, A1C DG, and SrA MW returned to the dormitory room. TSgt VC did not see SrA MW go into Appellant's bedroom, but she did see him run out of

the quarters after a short period of time.[5] A1C DG told TSgt VC he did not feel well and he could not remember where he lived, so TSgt VC had him sleep on the sofa while she would sleep in a recliner. A1C DG was fully clothed at that point, with a small blanket over him.

TSgt VC then fell asleep but was awakened by a noise. She saw Appellant standing and holding A1C DG up from behind, and "pulling" A1C DG towards Appellant's bedroom. A1C DG was not moving or making any sound. Appellant had evidently bumped into a table, which made the noise that awoke TSgt VC. TSgt VC asked Appellant if everything was "okay," and Appellant responded that A1C DG was "fine" and Appellant was just putting him to bed. Appellant then dragged A1C DG to his bedroom and placed him on Appellant's bed. While Appellant was in his bathroom, TSgt VC went to Appellant's bedroom to look at A1C DG. TSgt VC saw that the blanket had shifted, A1C DG's pants were pulled down, and his genitals were exposed. According to TSgt VC, at that point she "yelled a little" which seemed to "startle" A1C DG, she put on her shoes and jacket, and she shook A1C DG and told him it was time to go. TSgt VC did not recall speaking with Appellant before she departed with A1C DG. TSgt VC then followed A1C DG as he walked to his dormitory room and helped him inside, where A1C DG lay on his bed.

Over the course of the morning of 3 August 2017, TSgt VC had the following text message exchange with Appellant:

> [Appellant:] I'm so sorry V….Idk what came over me [sad face emoji]
>
> [TSgt VC:] Anthony he is drunk
>
> [TSgt VC:] He doesn't even know what you did
>
> [TSgt VC:] I just can't
>
> [TSgt VC:] I mean Anthony he is black out drunk…..I just can't deal with this
>
> [Appellant:] I don't f**king know V
>
> [Appellant:] I don't know

---

[5] SrA MW also testified at Appellant's trial. SrA MW's account was generally consistent with the testimony of A1C DG and TSgt VC. In addition, he testified that when the group was at the smoke pit for the second time, Appellant texted him to say that SrA MW was "cute" and should "come up privately" to Appellant's quarters. SrA MW testified that he went into Appellant's room, where Appellant invited SrA MW to get into the bed with him and "nothing had to happen." When SrA MW "kept telling [Appellant] no," Appellant eventually "basically kicked [SrA MW] out of his room."

[Appellant:] Wtf

[Appellant:] Idk

[TSgt VC:] What was done to him while I was sleep?

[Appellant:] Nothing. Just picked him up

[TSgt VC:] Why were his pants down?

[Appellant:] V, at this point, Idk. When you said wtf Anthony, i asked myself the same. I just kinda threw him on my bed, sat for a second thinking wtf, and walked out of my room. I wasn't in my room long enough to do s**t. Idk boo. I apologize for everything. I know you probably won't forgive me….Idk wtf came over me

[Appellant:] [large sad face emoji]

[Appellant:] Can I come back over? Or we talk outside?

[TSgt VC:] I don't think either is good

After TSgt VC and TSgt DM arrived at A1C DG's room that morning, they explained that they suspected A1C DG had been a victim of sexual assault. A1C DG initially did not understand that Appellant was the object of their suspicions, until TSgt VC invited A1C DG to have lunch with her at an on-base restaurant and there described in more detail what she had seen the previous night. At some point TSgt DM joined them, and then they noticed Appellant entered the same restaurant. A1C DG confronted Appellant at the restaurant and demanded to know what Appellant had done and why; Appellant responded only that he did not know what he was doing. TSgt DM drew Appellant away from A1C DG to another table. TSgt DM told Appellant "the situation is not going to go away," to which Appellant responded, "[I]f I have to face the music, I'll face the music."

A1C DG reported the incident and underwent a sexual assault forensic exam. Testing disclosed the presence of Appellant's DNA on swabs taken from A1C DG's penis and rectal area. At trial, MT, the forensic biologist who performed the DNA testing, testified as an expert witness and explained that on the swab taken from A1C DG's penis, 93 percent of the DNA present was from Appellant's epithelial (skin) cells and only seven percent was from A1C DG. MT opined the presence of so much of Appellant's DNA was more likely due to a "wet direct transfer" rather than a simple dry touch or an indirect transfer from another object with Appellant's DNA on it.

Agents of the Air Force Office of Special Investigations (AFOSI) interviewed Appellant regarding this incident. Appellant acknowledged that "for whatever reason" he picked A1C DG up from the couch where he was sleeping.

Appellant acknowledged he had had no discussion with A1C DG about any "romantic interest." He denied having a romantic interest in A1C DG, although he acknowledged A1C DG was "decent looking." He told the agents he did not know why he picked up A1C DG, which he described as "the million-dollar question" and "the most stupidest thing [he had] ever done." Appellant speculated that he picked up A1C DG for "comfort . . . almost like a cuddle buddy maybe." He denied knowing A1C DG's pants were down, although he "believe[d]" TSgt VC when she said that they were.

## B. SrA LS

In the course of AFOSI's investigation of A1C DG's report, an agent interviewed SrA LS, another Airman stationed at Osan AB who frequented the smoke pit and was an acquaintance of Appellant. SrA LS did not initially provide the agent any information related to Appellant. However, SrA LS later testified that after the interview, he realized that the case the agent had described "had a lot of similarities" to an experience SrA LS had with Appellant, and he called the agent back the same day.

SrA LS initially became acquainted with Appellant when he would "see him once in a while at the smoke pit." One evening in June or July 2017, Appellant invited SrA LS to join him and a group of Appellant's friends who were drinking alcohol and socializing at the smoke pit. SrA LS had already consumed a significant amount of alcohol that evening, including two shots of tequila and between five and seven shots of whiskey. SrA LS did not know the other individuals with Appellant, but they included TSgt DM[6] and A1C JH among others. SrA LS stayed with the group and drank with them for approximately 45 minutes before a group of five individuals, including SrA LS, proceeded to Appellant's dormitory room to watch movies and continue drinking.

At Appellant's quarters, SrA LS drank whiskey and several glasses of wine. Appellant sat next to SrA LS, talked with him, and touched him on the arm. Eventually, Appellant pulled SrA LS up from his seat and directed him to Appellant's bedroom. At trial, SrA LS described himself as "intoxicated" and "fairly wobbly" at this point, and testified he initially believed he was being taken back to his own room. SrA LS recalled being lifted up and then falling face-down onto Appellant's bed. Appellant then rolled SrA LS over and removed his clothes. SrA LS testified he "wasn't sure exactly what was happening at this point," and he said "no" in a "fairly nonchalant" tone that "wasn't very loud."

SrA LS's next memory was of Appellant "attempting to perform oral sex" on him, with his penis in Appellant's mouth. SrA LS described his memory as

---

[6] This is the same TSgt DM who later spoke with A1C DG on 3 August 2017.

"very blotty, and splotchy, and very hazy" at this point, but SrA LS did not consent and he did recall saying "no" several times. The final time SrA LS said "no," he spoke "a bit louder and pushed [Appellant] off." According to SrA LS, the bedroom door opened and TSgt DM and A1C JH entered; they were naked, as was Appellant and SrA LS at this point. According to SrA LS, Appellant made a comment to the effect that SrA LS could not get an erection, at which point the three individuals took turns attempting to perform oral sex on SrA LS. Eventually, TSgt DM "stated that it was not going to happen" and told the others to leave the room, which they did. SrA LS got dressed and departed with TSgt DM, who went with SrA LS to SrA LS's dormitory room. According to SrA LS, he told TSgt DM that TSgt DM could sleep on the floor, but when SrA LS awoke in the morning TSgt DM was sleeping in SrA LS's bed, so SrA LS told TSgt DM to leave.

A1C JH and TSgt DM also testified regarding this incident under grants of testimonial immunity from the convening authority. Each professed to have no memory of significant portions of the night and each provided a significantly different account of events.

TSgt DM was called by the Government. He described being with Appellant and A1C JH when they met SrA LS at the smoke pit. SrA LS agreed to go with them back to Appellant's room. SrA LS brought his own alcohol, and the group drank heavily. TSgt DM testified that from that point on, "[his] memory start[ed] going in and out." He recalled at one point there was a dare that SrA LS would kiss him if he drank a glass of cognac, which happened.[7] TSgt DM also had a vague memory of putting his shoes on at one point to return to the smoke pit. TSgt DM's next memory was of waking up in Appellant's living room and needing to vomit. TSgt DM ran into the shower and turned it on and vomited in the shower. When TSgt DM finished his shower, A1C JH came into the bathroom naked and told him to come into Appellant's bedroom. TSgt DM went to the bedroom wearing only a towel around his waist. There he saw SrA LS lying face-down on the bed with Appellant lying on top of him, and A1C JH sitting nearby on the bed; all three were naked. Appellant was whispering in SrA LS's ear and "kissing his neck . . . kind of kissing on his body and rubbing his body;" SrA LS was awake but "just wasn't reciprocating." According to TSgt DM, he felt uncomfortable with this situation and asked Appellant and A1C JH to leave the room, which they did. TSgt DM then asked SrA LS if he was "okay." SrA LS responded that he was not "comfortable," but if he could go to sleep and "nobody touche[d] [him]," he would be "okay." However, Appellant

---

[7] SrA LS had previously testified on cross-examination that he remembered the dare being made but did not remember who proposed it or that he and TSgt DM had followed through on it.

returned to the room and lay down on top of SrA LS again in the same position. At that point TSgt DM left the room, got dressed, returned to the bedroom and "yelled" to SrA LS that if he was uncomfortable and needed to go home, TSgt DM would take him home. According to TSgt DM, at that point everyone got dressed and returned to the smoke pit. Appellant expressed to TSgt DM that he was "upset" that TSgt DM had "stopped it." From the smoke pit, TSgt DM walked with SrA LS back to SrA LS's room. TSgt DM spoke with Appellant about the incident the following day. Appellant complained that TSgt DM interfered, that "they weren't doing anything that [SrA LS] didn't want to do," and that TSgt DM had "c*ck blocked" Appellant.

A1C JH was called by the Defense. He testified that he did not recall how SrA LS came to be part of the group that evening. Once the group arrived at Appellant's quarters, they drank and talked for a while. A1C JH began "making out" with TSgt DM while Appellant and SrA LS went into Appellant's bedroom with the door closed. A1C JH and TSgt DM then "had sex" on the couch for "[a]bout 45 minutes." At one point Appellant came out of the bedroom, watched A1C JH and TSgt DM for some period of time, and then slapped A1C JH on the buttocks, none of which A1C JH found offensive. At that point A1C JH could see SrA LS through the bedroom door with no shirt on; A1C JH could not tell if SrA LS was wearing anything else. Appellant returned to the bedroom, and eventually A1C JH and TSgt DM stopped having sex and took separate showers. After the showers, A1C JH saw Appellant exit the bedroom and TSgt DM go in. A1C JH did not remember how the night ended or where he slept. In particular, he had no memory of being in Appellant's bedroom or engaging in oral sex with SrA LS.

The Defense called another Airman, A1C MG, to testify about this incident. A1C MG was present during earlier portions of the evening, and was evidently the fifth individual who SrA LS described going to Appellant's room that evening. A1C MG testified he went with Appellant, a "Security Forces guy" (evidently SrA LS), TSgt DM, and another individual (presumably A1C JH) from the smoke pit to Appellant's room. A1C MG perceived that SrA LS was "getting hit on" by the other three, especially Appellant, although "everyone was laughing and joking" and SrA LS "wasn't mad about it." At one point, A1C MG heard SrA LS say, "if I were gay you wouldn't be able to handle this." A1C MG eventually left because he "didn't really feel in place." He saw the group again later that night at the smoke pit, at which point SrA LS appeared "heavily intoxicated," was vomiting, and had to be supported when he walked.

SrA LS did not initially report this incident to law enforcement or the chain of command, and he continued to have some contact with Appellant until he was interviewed by AFOSI in relation to A1C DG in September 2017. For example, Appellant continued to send SrA LS messages inviting him to the

smoke pit; SrA LS became "Facebook friends" with Appellant on 3 August 2017; and on 12 August 2017 SrA LS invited Appellant to an event being held by a running club of which SrA LS was a member. SrA LS testified that Appellant did not try to initiate sexual activity with him again, and SrA LS was not concerned that Appellant would try. SrA LS testified he "didn't quite know what to think of the whole situation" and was inclined to "pass it off" as simply "drunk idiots" doing "really dumb stuff." However, SrA LS was motivated to "come forward" after the AFOSI interview when he learned that "it was happening to other people."

Appellant was convicted of touching directly A1C DG's genitalia when he knew A1C DG was asleep, with the intent to gratify his sexual desire; and causing penetration of Appellant's mouth by SrA LS's penis by causing bodily harm to him, specifically by causing the penetration without SrA LS's consent.

## II. DISCUSSION

### A. Legal and Factual Sufficiency[8]

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption

---

[8] Appellant raises his challenges to the legal and factual sufficiency of his conviction for sexual assault against SrA LS and A1C DG as separate assignments of error, but we consider them together in this section of the opinion.

of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

### 2. Analysis

#### a. SrA LS

The elements of the specification of the charge of sexual assault in violation of Article 120, UCMJ, for which Appellant was convicted included: (1) that at or near Osan AB between on or about 1 June 2017 and on or about 31 July 2017, Appellant committed a sexual act on SrA LS by causing SrA LS's penis to penetrate Appellant's mouth; (2) that Appellant did so by causing bodily harm, to wit: causing penetration of Appellant's mouth by SrA LS's penis without consent. *See Manual for Courts-Martial, United States* (*MCM*), pt. IV, ¶ 45.b.(3)(b).

The Government introduced direct evidence in support of both elements through SrA LS's testimony. SrA LS testified that Appellant placed SrA LS's penis in Appellant's mouth. SrA LS further testified that he did not consent, and that he repeatedly told Appellant "no" as Appellant was removing his clothing and when Appellant was placing SrA LS's penis in his mouth, before SrA LS eventually pushed Appellant off of him.

Appellant challenges SrA LS's credibility in several respects. First, he argues that SrA LS acknowledged he was very drunk that night and his memory was hazy. Although there are parts of the evening he cannot recall, his testimony that Appellant placed SrA LS's penis in Appellant's mouth was clear and unequivocal. Moreover, SrA LS testified the initial sexual assault by Appellant lasted about 30 minutes; it stands to reason he would be more likely to recall such an extended event as opposed to passing details of the evening.

Appellant also argues TSgt DM and A1C JH denied sexually assaulting SrA LS as he testified they did, or that they saw anyone else touch SrA LS's penis. However, the testimony of both TSgt DM and A1C JH is fraught with its own credibility problems. Notwithstanding their grants of testimonial immunity, it is evident that both had a strong personal interest in not admitting that they committed sexual acts on SrA LS without his consent. In addition, both TSgt DM and A1C JH testified that they also could not recall extended—and, arguably, convenient from their perspective—portions of the evening. For example, TSgt DM purported to have no memory of much of the night before he woke up, vomited, and took a shower, including no memory of engaging in sex with A1C JH for approximately 45 minutes as A1C JH testified. For his

part, A1C JH testified he could not remember what happened that night after he and TSgt DM took showers.

What we find to be more probative is that the testimony of TSgt DM and A1C JH, such as it was, reinforced SrA LS's testimony in two significant respects. First, A1C JH's testimony confirmed Appellant was alone in the bedroom with SrA LS for an extended period of time, and TSgt DM's purported lack of memory was hardly inconsistent in this respect. Second, although TSgt DM did not testify to seeing Appellant specifically touch SrA LS's penis when he entered the bedroom after the shower, his description of Appellant lying naked on top of a naked but nonreciprocating SrA LS, evidently attempting to stimulate or entice him, strongly suggested Appellant's sexual intent with regard to SrA LS as well as SrA LS's lack of interest. TSgt DM's account of how the night ended with TSgt DM extracting SrA LS from Appellant's unwanted sexual attention, although not identical to SrA LS's account, strongly echoes his testimony.

Appellant also focuses on the fact that SrA LS continued to associate with Appellant after this incident. However, we find SrA LS's confusion and initial desire to put the incident behind him to be plausible. There is no particular expected way for a sexual assault victim to act, and SrA LS's behavior was not such that it substantially undermines his credibility. Similarly, we find SrA LS's re-evaluation of the incident in light of learning Appellant had allegedly committed a sexual offense against another Airman to also be plausible.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction for sexual assault on SrA LS beyond a reasonable doubt. *See Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the military judge did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction of the Charge and its specification of sexual assault on SrA LS are therefore both legally and factually sufficient.

### b. A1C DG

The elements of the specification of the charge of abusive sexual contact in violation of Article 120, UCMJ, for which Appellant was convicted included: (1) that at or near Osan AB on or about 3 August 2017, Appellant committed sexual contact upon A1C DG by touching directly A1C DG's genitalia; (2) that Appellant did so when A1C DG was asleep; (3) that Appellant knew A1C DG was asleep; and (4) that Appellant did so with the intent to gratify his sexual desire. *See MCM*, pt. IV, ¶ 45.b.(7)(e).

Although A1C DG, unlike SrA LS, did not remember the offense, the Government's case that Appellant committed abusive sexual contact against A1C DG was strong. A1C DG was clothed when TSgt VC had him lie down to sleep on Appellant's sofa. TSgt VC awoke to find Appellant dragging an apparently unconscious A1C DG into Appellant's bedroom. When TSgt VC looked into the bedroom, she saw A1C DG's pants were lowered and his genitals exposed. Appellant failed to defend or explain himself in any coherent way the following day when TSgt VC confronted Appellant by text message or when A1C DG confronted him in person. Instead, Appellant only indicated he "did not know" why he did what he did, and told TSgt DM he would "face the music" if he had to. Furthermore, the DNA sample from A1C DG's penis found an overwhelming concentration of Appellant's DNA, suggesting a "wet direct transfer" rather than a secondary transfer from Appellant's blanket, bed, or other source.

Appellant argues TSgt VC saw Appellant moving A1C DG, but did not see Appellant touch A1C DG's penis. However, TSgt VC did not testify that she maintained "line of sight" on Appellant and A1C DG after she woke up; on the contrary, she estimated that between one and two minutes elapsed before she got up from the recliner in the living room to go look in the bedroom. Even setting aside that opportunity, it is evident Appellant had the opportunity to touch A1C DG's penis *before* TSgt VC awoke, while A1C DG was still asleep on the sofa.

Appellant contends it was possible that the epithelial cells which were the source of the DNA found on A1C DG's penis and rectal area were from Appellant's bed or blanket, but we find this suggestion contrary to the weight of the expert testimony and other evidence. Similarly, we do not find Appellant's denials during his AFOSI interview to be persuasive.

We conclude the evidence is both legally and factually sufficient to support Appellant's conviction for abusive sexual contact against A1C DG beyond a reasonable doubt. *See Barner*, 56 M.J. at 134 (citations omitted); *Turner*, 25 M.J. at 325.

## B. Defense-Requested Instruction

### 1. Additional Background

The Defense requested that the military judge provide the following instruction to the court members for their deliberations on findings:

> There has been some evidence concerning [SrA LS's] state of intoxication at the time of the alleged offenses. The charge and its specifications do no[t] allege that [SrA LS] was incapable of consenting to sexual activity, due to impairment by alcohol. Therefore, as a matter of law, you are instructed that [SrA LS] was capable of consenting to the sexual activity at issue in this case.

> You may consider his intoxication, if any, for any other purpose, to include whether or not he actually consented to the sexual conduct at issue.

Senior defense counsel explained that by charging Appellant with sexual assault and abusive sexual contact against SrA LS by bodily harm, specifically the absence of consent, the Government had "made this decision for the members" that SrA LS "was capable of consenting." He contended the requested instruction was necessary in order to prevent the court members from deciding SrA LS was not able to consent and convicting Appellant on that basis, thereby finding him "guilty of something that he wasn't charged with, without a proper understanding of the law."

The Government opposed the instruction, and the military judge declined to give it. The military judge explained his ruling on the record. Relying on *United States v. Pease*, 75 M.J. 180, 185 (C.A.A.F. 2016), *United States v. Elespuru*, 73 M.J. 326, 329 (C.A.A.F. 2014), and *United States v. Cagle*, No. ACM 38592, 2015 CCA LEXIS 294, at *7 (A.F. Ct. Crim. App. 16 Jul. 2015) (unpub. op.), the military judge concluded that "the victim's level of intoxication, if any, is relevant to the issue of whether the victim consented or did not consent. The Court will not give an instruction that the victim, by operation of law, was capable of consenting simply because of the government's charging theory."

### 2. Law

"[A]ny party may request that the military judge instruct the members on the law as set forth in the request." Rule for Courts-Martial (R.C.M.) 920(c). However, the military judge has substantial discretionary power in deciding what non-required instructions to give. *United States v. Damatta-Olivera*, 37 M.J. 474, 478 (C.M.A. 1993) (citing R.C.M. 920(c), Discussion; *United States v. Smith*, 34 M.J. 200 (C.M.A. 1992)). Denial of a defense-requested instruction is reviewed for abuse of discretion. *United States v. Carruthers*, 64 M.J. 340, 345–46 (C.A.A.F. 2007) (citations omitted). We apply a three-part test to evaluate whether the failure to give a requested instruction is error: "(1) [the requested instruction] is correct; (2) it is not substantially covered in the main [instruction]; and (3) it is on such a vital point in the case that the failure to give it deprived [Appellant] of a defense or seriously impaired its effective presentation." *Id.* at 346 (first and second alteration in original) (quoting *United States v. Gibson*, 58 M.J. 1, 7 (C.A.A.F. 2003)). All three prongs of the test must be satisfied in order to find error. *United States v. Barnett*, 71 M.J. 248, 253 (C.A.A.F. 2012).

The adequacy of the military judge's instructions is reviewed de novo. *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006) (citations omitted).

As charged in this case, in order for the court members to find Appellant guilty of sexual assault against SrA LS, the Government was required to prove beyond a reasonable doubt that, *inter alia*, Appellant caused the penetration of Appellant's mouth by SrA LS's penis without SrA LS's consent. *See MCM*, pt. IV, ¶ 45.b.(3)(b). "Consent" is defined as "a freely given agreement to the conduct at issue by a competent person." *MCM*, pt. IV, ¶ 45.a.(g)(8)(A). "Lack of consent may be inferred based on the circumstances of the offense. All of the surrounding circumstances are to be considered in determining whether a person gave consent . . . ." *MCM*, pt. IV, ¶ 45.a.(g)(8)(C).

### 3. Analysis

Appellant asserts the military judge was "constitutionally required" to instruct the court members that SrA LS was capable of consenting to the alleged sexual act by Appellant, and his failure to do so "resulted in Appellant being convicted under a theory of liability that was not charged." Appellant's argument is founded on the idea that "[a] bodily harm theory [of sexual assault] requir[ing] proof that an act was done without . . . lawful consent" is "mutually exclusive" with an "incapacitation theory requir[ing] proof the alleged victim was unable to say 'no' because of 'impairment.'" Therefore, he argues, in order to preserve both theories at trial, the Government is required to charge each theory separately in the alternative. We disagree.

On appeal, as at trial, Appellant entirely fails to explain why proof that SrA LS *could not* consent due to impairment by alcohol would not be relevant to prove that he *did not* consent, and thereby satisfy the elements of sexual assault by causing bodily harm, with which he was charged and for which he was convicted. The military judge correctly concluded that SrA LS's level of intoxication was part of the surrounding circumstances the court members could evaluate to determine whether he actually consented, or potentially whether Appellant made a reasonable mistake of fact as to whether SrA LS consented. It is hardly a novel situation that the available evidence in a particular case might meet the elements of multiple offenses, affording the Government some discretion in its charging decisions. *See Elespuru*, 73 M.J. at 329. The Constitution does not require the military judge to give instructions directing the court members to presume certain facts about the case, which may be unwarranted by the evidence, based on such charging decisions, in order to contradict elements of an offense with which Appellant was not charged. Instead, the relevant question is whether the military judge properly instructed the court members with respect to the offenses with which Appellant *was* charged, and whether the evidence in the case meets those elements.

Accordingly, the proper framework to assess the Defense's request for this instruction is the three-part test articulated in *Carruthers*, 64 M.J. at 346 (citations omitted). In order to prevail on appeal, Appellant must demonstrate all

three prongs, but in this case we need go no further than the first. *See Barnett*, 71 M.J. at 253. It is not a correct statement of law that the court members must presume, "as a matter of law," that SrA LS was capable of consenting to sexual activity simply because Appellant was charged under a bodily harm theory of sexual assault rather than a theory that he was incapable of consenting. Moreover, we have reviewed de novo the adequacy of the instructions the military judge did give, *see Dearing*, 63 M.J. at 482, and we find the military judge properly instructed the members with respect to the elements, definitions, and potential defense of mistake of fact as to consent with respect to the charged sexual assault on SrA LS by causing bodily harm, in accordance with the *Manual for Courts-Martial* and *Pease*, 75 M.J. at 185.

## C. Post-Trial Hearing or New Trial

### 1. Law

Article 39(a), UCMJ, 10 U.S.C. § 839(a), authorizes a military judge to call a court-martial into session without the court members for various purposes, including *inter alia* hearing motions and other matters to be determined by the military judge. A convening authority may direct a post-trial Article 39(a), UCMJ, session "any time before the convening authority takes initial action on the case or at such later time as the convening authority is authorized to do so by a reviewing authority." R.C.M. 1102(d); *see also United States v. Hull*, 70 M.J. 145, 151 (C.A.A.F. 2011). Such post-trial sessions may be called, *inter alia*, "for the purpose of inquiring into, and, when appropriate, resolving any matter that arises after trial and that substantially affects the legal sufficiency of any findings of guilty or the sentence." R.C.M. 1102(b)(2). "When an appellant requests the convening authority to order a posttrial [sic] Article 39(a) session, it is a matter for the convening authority's sound discretion whether to grant the request." *United States v. Ruiz*, 49 M.J. 340, 348 (C.A.A.F. 1998).

A petitioner may petition for a new trial "on the grounds of newly discovered evidence or fraud on the court." Article 73, UCMJ, 10 U.S.C. § 873. A petition for a new trial does not proceed through the usual appellate process. *See id.*; *United States v. Brooks*, 49 M.J. 64, 68 (C.A.A.F. 1998). Instead, it is submitted to The Judge Advocate General, who acts on the petition unless the case is pending before an appellate court, in which case he refers the petition to the appellate court where the case is pending. R.C.M. 1210(a), (e). "[R]equests for a new trial . . . are generally disfavored," and are "granted only if a manifest injustice would result absent a new trial . . . ." *Hull*, 70 M.J. at 152 (quoting *United States v. Williams*, 37 M.J. 352, 356 (C.M.A. 1993)).

### 2. Analysis

Appellant personally asserts he has suffered a "manifest injustice" that "constitutionally required" the convening authority to take corrective action,

either by directing a post-trial Article 39(a), UCMJ, session or a new trial pursuant to Article 73, UCMJ. Appellant relies substantially on documents he moved to attach to the record regarding events after his court-martial concluded in October 2018. These documents tend to indicate that after the convening authority took action on Appellant's sentence: (1) a pending charge that TSgt DM sexually assaulted SrA LS was dismissed, with SrA LS's support; and (2) A1C JH was acquitted of one specification of sexually assaulting SrA LS. The essence of Appellant's complaint is that it is unjust that he was convicted of sexual assault against SrA LS while the other two alleged perpetrators were not, and that he was denied the opportunity to use these developments to further attack the reliability of SrA LS's testimony at his own trial. Appellant cannot prevail on the asserted grounds.

With regard to reviewing the convening authority's failure to direct an Article 39(a), UCMJ, session for an abuse of discretion, as an initial matter we find we cannot consider the documents regarding the non-prosecution of TSgt DM and acquittal of A1C JH upon which Appellant relies. These materials are outside the "entire record" as our superior court recently explained that term in *United States v. Jessie*, 79 M.J. 437, 440–41 (C.A.A.F. 2020) (citations omitted); *see* Article 66(c), UCMJ, 10 U.S.C. § 866(c). Generally, Article 66, UCMJ, does not authorize a Court of Criminal Appeals to consider materials outside the "entire record" when reviewing issues that were not raised by anything in the record. *Jessie*, 79 M.J. at 444.

Additionally, the convening authority took action on Appellant's court-martial on 29 January 2019. At that point—months before the charge against TSgt DM was dropped and A1C JH was acquitted—the convening authority lost the ability to direct a post-trial hearing, unless and until a reviewing authority authorized him to do so. Thus, the events Appellant now relies on as the basis for the convening authority's alleged abuse of discretion had not occurred while the convening authority still had the ability to act. Furthermore, the record contains no indication the Defense requested either the military judge or the convening authority to hold or direct a post-trial session, for any reason. Under these circumstances, Appellant's claim that the convening authority abused his discretion by failing to direct a post-trial Article 39(a), UCMJ, session must fail.

Our analysis of Appellant's complaint that the convening authority was required to direct a new trial pursuant to Article 73, UCMJ, is even more succinct. The convening authority does not act on petitions for a new trial pursuant to Article 73, UCMJ. Such petitions are to be directed to The Judge Advocate General, who either acts upon the petition or, if the case is pending before an appellate court, refers the petition to the court for action. In any event, we

have no indication Appellant has submitted such a petition to The Judge Advocate General. Accordingly, Appellant's claim is without merit.

**D. Post-Trial Delay**

Appellant's case was initially docketed with this court on 21 February 2019. Appellant filed his initial assignments of error on 18 September 2019 after requesting and receiving four enlargements of time. On 2 October 2019, Appellant moved for leave to file a supplemental brief and declaration in order to personally raise matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982); the court granted this motion on 10 October 2019. The Government filed its answer on 22 October 2019. This opinion is issued 18 months and 12 days after Appellant's case was initially docketed with this court.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) established a presumption of facially unreasonable delay when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). In this case, we find no oppressive incarceration because Appellant's appeal has not resulted in any reduction in his term of confinement. Similarly, where the appeal does not result in a rehearing on findings or sentence, Appellant's ability to present a defense at a rehearing is not impaired. *Id.* at 140. As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners

17

awaiting an appellate decision." *Id*. We discern no such particularized anxiety in Appellant's case.

In this case, the delay in issuing the court's opinion exceeded the 18-month *Moreno* standard by less than two weeks. The record of trial is substantial, including over 1,100 pages of transcript and numerous exhibits. Moreover, the evidence is complex and consists of several conflicting accounts marked by significant gaps in memory, requiring careful consideration and analysis. On the whole, we do not find the delay so egregious as to adversely affect the perceived fairness and integrity of the military justice system. *See id*.

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court