# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40617**

**Misc. Dkt. No. 2026-02**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jonathon V. TYSON**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 13 April 2026

————————————

*Military Judge*: David M. Cisek (arraignment and motions); Dayle P. Percle (trial).

*Sentence*: Sentence adjudged 16 December 2023 by GCM convened at Minot Air Force Base, North Dakota. Sentence entered by military judge on 2 February 2024: Bad-conduct discharge, confinement for 1 year, and reduction to E-1.

*For Appellant*: Major Samantha M. Castanien, USAF.

*For Appellee*: Colonel G. Matt Osborn, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Vanessa Bairos, USAF; Major Kate E. Lee, USAF; Major Jocelyn Q. Wright, USAF; Major Catherine D. Mumford, USAF; Captain Donnell D. Wright, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, DOUGLAS, and MCCALL, *Appellate Military Judges*.

Senior Judge DOUGLAS delivered the opinion of the court, in which Chief Judge JOHNSON and Judge MCCALL joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

---

DOUGLAS, Senior Judge:

Contrary to his pleas, a general court-martial composed of officer and enlisted members found Appellant guilty of six specifications of domestic violence in violation of Article 128b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928b.[1,2] Appellant's intimate partner, MR, is the named victim in all specifications. The members sentenced Appellant to a bad-conduct discharge, confinement for one year, and reduction to the grade of E-1.[3] The convening authority took no action on the findings or the sentence. Appellant requested suspension, commutation, or reduction of the adjudged reduction in pay grade, which was denied due to the severity of the crimes. Appellant requested waiver of automatic forfeitures, which was also denied.

Appellant raises 13 issues on appeal, which we have rephrased, whether: (1) he was denied meaningful cross-examination of MR in violation of his Sixth Amendment[4] right to confrontation when the trial judge excluded evidence offered under Mil. R. Evid. 608(c); (2) his conviction for strangling MR is factually sufficient; (3) his conviction for kicking MR in the legs on divers occasions is legally and factually sufficient; (4) his conviction for punching MR in the arms and torso on divers occasions is legally and factually sufficient; (5) his conviction for destroying MR's cellphone is legally and factually sufficient; (6) his conviction for destroying a variety of MR's belongings is legally and factually sufficient; (7) his conviction for threatening MR on divers occasions is legally and factually sufficient; (8) trial counsel committed prosecutorial misconduct during the findings argument; (9) omission of 14 files in Preliminary Hearing Exhibit 16 is a substantial omission that requires remand; (10) the 172-day delay from sentencing to docketing warrants relief; (11) he was deprived of his constitutional right to a unanimous verdict; (12) he was subject to vindictive prosecution; and (13) barring him from multiple Air Force installations while

---

[1] All references in this opinion to the UCMJ, the Rules for Courts-Martial (R.C.M), and the Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Consistent with his pleas, the same general court-martial found Appellant not guilty of three specifications of domestic violence in violation of Article 128b, UCMJ.

[3] Appellant was credited with 246 days of pretrial confinement.

[4] U.S. CONST. amend. VI.

on appellate leave constitutes unlawful punishment or otherwise violates the law.[5] We also considered one additional issue not raised by Appellant, but identified during this court's Article 66(d), UCMJ, 10 U.S.C. § 866(d), review: whether (14) Appellant is entitled to relief for facially unreasonable appellate delay in accordance with *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), or Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2).

On 23 January 2026, Appellant petitioned for a new trial pursuant to Article 73, UCMJ, 10 U.S.C. § 873. The court docketed Appellant's petition the same day. The Government filed its timely response on 23 February 2026, and Appellant filed a reply to the Government's response on 9 March 2026. Therefore, we consider Appellant's petition for a new trial with his other assertions of error.

We have combined our review and analysis of Appellant's issues (2) through (7) because they relate to the legal and/or factual sufficiency of Appellant's convictions. Similarly, we have combined our review and analysis of issues (10) and (14) because they both relate to post-trial processing delay.

Four issues are resolved with brief explanation. With respect to issue (9), we find the omission of 14 audio and visual files provided to the preliminary hearing officer (PHO) as Preliminary Hearing Exhibit 16 is not substantial. *United States v. Davenport*, 73 M.J. 373, 377 (C.A.A.F. 2014). On 5 November 2025, the court granted a government motion to attach documents. We now consider those attachments, including a declaration submitted by one of the legal office paralegals, Technical Sergeant (TSgt) VP, as well as four additional files not otherwise found in the record of trial.[6] The 14 audio and visual files provided as Preliminary Hearing Exhibit 16 were corrupted upon assembly of Appellant's record of trial. However, they are each described in detail in TSgt VP's declaration, and either exist elsewhere in the record of trial, the report of investigation by the Air Force Office of Special Investigations (OSI), or are now attached. Appellant does not allege prejudice. The PHO report is properly attached to the record of trial, and the report briefly summarizes Exhibit 16 as 14 audio and visual files. Their omission as Preliminary Hearing Exhibit 16 does not affect our ability to complete appellate review of Appellant's convictions and sentence.

As to issue (11), Appellant is not entitled to relief. *See United States v. Anderson,* 83 M.J. 291, 302 (C.A.A.F. 2023) (holding that a military accused does

---

[5] Appellant personally raises issues (12) and (13) pursuant to *United States v. Grostefon*, 12 M.J. 431, 436 (C.M.A. 1982).

[6] *See United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020).

not have a right to a unanimous verdict under the Sixth Amendment, the Fifth Amendment's due process clause, or the Fifth Amendment's component of equal protection[7]), *cert. denied*, 144 S. Ct. 1003 (2024).

As to issue (12), we have carefully considered Appellant's personally raised concern that the OSI conducted a biased investigation, leading to a discriminatory or vindictive prosecution. This concern is raised for the first time on appeal. On 8 September 2025, the court granted Appellant's motion to attach a declaration by Appellant, dated 27 August 2025. We now consider this declaration.[8] In his declaration, Appellant asserts OSI did not sufficiently investigate whether the named victim, MR, was being truthful with various aspects of her statements.

"By advancing [a] selective prosecution argument, [A]ppellant asserts a defect in the preferral and referral of the charges." *United States v. El-Amin*, 38 M.J. 563, 564 (A.F.C.M.R. 1993) (citations omitted). At trial, Appellant was required to raise any objections to defects in the preferral and referral of his charges prior to entering his pleas. Rule for Courts-Martial (R.C.M.) 905(b)(1). Failure to do so constitutes forfeiture. R.C.M. 905(e)(1). If not forfeiture, Appellant's concern of discriminatory or vindictive prosecution fails because even after considering Appellant's declaration, the record is devoid of evidence of discriminatory or vindictive prosecution.

> To support a claim of selective or vindictive prosecution, an accused has a "heavy burden" of showing that "others similarly situated" have not been charged, that "he has been singled out for prosecution," and that his "selection . . . for prosecution" was "invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights."

*United States v. Argo*, 46 M.J. 454, 463 (C.A.A.F. 1997) (quoting *United States v. Garwood*, 20 M.J. 148, 154 (C.M.A. 1985)). We find no error materially prejudicial to Appellant's substantial rights as to this concern. Articles 59(a), UCMJ, 10 U.S.C. § 859(a).

With respect to issue (13), we have carefully considered Appellant's personally raised perspective that post-trial barments from military installations are errors in post-trial processing for which we can order appropriate relief under Article 66(d)(2), UCMJ. However, we find the matter is collateral and beyond

---

[7] U.S. CONST. amend. V.

[8] *See Jessie*, 79 M.J. at 444.

this court's statutory authority to review. A Court of Criminal Appeals (CCA) "may act only with respect to the findings and sentence as entered into the record under [Article 60c, UCMJ, 10 U.S.C. § 860c]." 10 U.S.C. § 866(d)(1). Consequently, Appellant's post-trial barments from one or more military installations do not require further discussion or warrant relief. *See United States v. Matias,* 25 M.J. 356, 361 (C.M.A. 1987).

As to the remaining issues, we find no error materially prejudicial to Appellant's substantial rights, and we affirm.[9] Further, we deny Appellant's petition for a new trial.

## I. BACKGROUND

Appellant met MR, an adult female civilian, while he was assigned to Minot Air Force Base, North Dakota. Shortly after meeting her, she moved into his house on base, and they began a two-year romantic relationship. That relationship ended on 14 April 2023.

On that day, MR, who worked as a base medical appointment clerk, called her military supervisor to explain that she would not be coming into work again, for the third day in a row. Captain (Capt) AR, MR's military supervisor, became concerned, because MR sounded like she was crying and he could hear another person walking around in the background. The call dropped. Capt AR could not reach MR again. So Capt AR, the first sergeant, and two members of Appellant's unit conducted a welfare check at Appellant's house.

Upon arrival, MR answered the door, disheveled and with a noticeable bruise on her exposed, right thigh. Appellant's unit members requested Appellant come to the door; when he refused, law enforcement was called and responded. Appellant was detained, and MR was medically evaluated. Photographs taken at the hospital revealed extensive bruising on MR's body, including her neck. Photographs taken at the house revealed damage to numerous personal items. These photographs were admitted as evidence in Appellant's court-martial.

---

[9] The panel was properly assembled; however, the trial judge neglected to announce the proper assembly as required by R.C.M. 911. Appellant does not allege prejudicial error, and we find none.

## II. DISCUSSION

### A. Excluded Evidence, Mil. R. Evid. 608(c)

#### 1. Additional Background

During cross-examination of MR, trial defense counsel attempted to establish MR had a motive to fabricate the source of her injury as alleged in Specification 3 of the Charge, by cutting her own leg with scissors. Trial defense counsel advocated the source of this cut on MR's leg was MR's own self-inflicted harm with scissors. The basis for this theory was a ten-year-old event, between MR and her ex-husband, the facts of which were deemed by the trial judge as failing to meet a direct nexus to Appellant's case, citing *United States v. Sullivan*, 70 M.J. 110, 115 (C.A.A.F. 2011). Despite Appellant's acquittal of this specification, Appellant maintains on appeal that the trial judge abused her discretion by excluding evidence offered under Mil. R. Evid. 608(c), *Evidence of Bias*, because it demonstrates MR fabricated all the allegations by creating and manipulating evidence.

#### 2. Law

We review a trial judge's decision to exclude evidence for abuse of discretion. *United States v. St. Jean*, 83 M.J. 109, 112 (C.A.A.F. 2023) (citing *United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019)). "This abuse of discretion standard is a strict one, calling for more than a mere difference of opinion—[t]he challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Id.* (alteration in original) (quoting *United States v. Hendrix*, 76 M.J. 283, 288 (C.A.A.F. 2017)).

The confrontation clause of the Sixth Amendment preserves the right of an accused "to be confronted with the witnesses against him." U.S. CONST. amend. VI.

"Bias, prejudice, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced." Mil. R. Evid. 608(c).

> An accused does not have a right to cross-examine a witness on any subject solely because he describes it as one of credibility, truthfulness, or bias. There must be a direct nexus to the case that is rooted in the record. That is, the evidence must be logically relevant as required by [Mil. R. Evid.] 401, and it must also be legally relevant in accordance with the [Mil. R. Evid.] 403 balancing test. In short, the right to cross-examine is the right to question where the proffer establishes a real and direct nexus to a fact or issue at hand.

*Sullivan*, 70 M.J. at 115.

### 3. Analysis

The trial judge did not abuse her discretion when she determined the facts, as presented, did not establish a nexus in Appellant's case. Outside the presence of members, the trial judge allowed the trial defense counsel to explore their theory of MR's motive to fabricate, specifically their proffered facts, through specific cross-examination of MR regarding the details of the ten-year-old event, which resulted in a security forces report. Further, the trial judge allowed the trial defense counsel to call and directly examine one of the security forces members responding to MR's residence at the time of the report of domestic violence between her and her ex-husband. The contradictory and unconfirmed evidence gathered in this hearing outside the presence of the members was well characterized by the trial judge as failing to have a direct nexus to Appellant's case. *See Sullivan*, 70 M.J. at 115. The trial judge did not abuse her discretion. Given all the evidence presented to her, her ruling was reasonable. *See St. Jean*, 83 M.J. at 112.

## B. Sufficiency of Convictions

### 1. Additional Background

The members convicted Appellant of six specifications of domestic violence against MR, his intimate partner: by unlawfully strangling her with his hands on 14 April 2023; by kicking her legs on divers occasions between 1 May 2022 and 14 April 2023; by punching her arms and torso on divers occasions between 1 May 2022 and 14 April 2023; by destroying a cellular device on 12 April 2023; by destroying MR's non-military personal property including clothing, shoes, hair appliances, toiletries, bags, a cooler, makeup items, eyeglasses, and other household items, on divers occasions, between 1 December 2022 and 14 April 2023; and by communicating a threat to MR on divers occasions between 1 December 2022 and 14 April 2023, to wit: "I'm going to have to kill you" and "I'm going to blow your brains out."

On appeal, Appellant challenges the factual sufficiency of the strangling conviction of MR on 14 April 2023. He challenges the remaining convictions due to lack of both legal and factual sufficiency. Appellant asserts MR is not "credible" for a variety of reasons, but primarily for being untruthful. All the reasons offered for MR's lack of credibility on appeal were explored at trial.

In early May 2022, Appellant returned home from temporary duty, after approximately three months of absence. MR observed her relationship with Appellant deteriorate "to the bad side." She described Appellant as getting "angrier over the littlest things." He began to destroy her belongings, kicked her

on her legs and punched her on both arms, starting with her left arm. On 6 May 2022, MR asked Appellant to take her to the hospital for chest pains. While at the hospital, and later while at home, MR took photographs of herself. Five photographs were admitted at trial, demonstrating bruises to her arms, wrist, and leg. MR also took a 13-second video of her legs, which demonstrated a variety of bruises on both of her legs. This video was also admitted at trial.

On 6 May 2022, while MR was checking herself into the hospital, Appellant discovered MR had been lying to him about her age. At trial, MR admitted she had presented herself to Appellant as approximately six years younger than she was, in part because she was always told she looked younger than her age, and in part because she understood that Appellant was not interested in dating older women.

The physical abuse continued and during a verbal argument on 26 July 2022, Appellant grabbed MR's arm, leaving visible bruises. MR took photographs of her arm, which demonstrated several smaller bruises on the inside and outside of her arm. Two photographs were admitted at trial from this event.

In February 2023, MR's relationship with Appellant continued to deteriorate. They were discussing potential separation and MR moving out of Appellant's house. However, MR mistakenly thought she was married to Appellant. She wore a ring on her left hand and recalled a specific proposal. She also recalled signing a specific piece of paper that she had not read, but Appellant insisted could, and would, be mailed to a different state which would form the basis of a legal marriage.

On 11 and 26 February 2023, MR recorded short videos of verbal arguments with Appellant, wherein MR is asking Appellant not to damage her candle holder with his hands and an icemaker with a multi-tool knife. Both videos were admitted at trial.

During the spring of 2023, MR explained that Appellant threatened her by saying things such as "I'm going to have to kill you," and "I'm going to blow your brains out." MR described the arguments and threats as happening "every day" or "every other day." Sometime in March 2023, MR recorded another video of Appellant and her arguing over him damaging her personal belongings. In this video, Appellant can be seen using a handheld tool and breaking a "charger" to MR's cell phone along with other items from the kitchen counter. The video ends with Appellant physically pushing and grabbing or punching MR; this video was also admitted at trial.

At work, MR's supervisor suspected personal or relationship issues and asked her about them. MR explained to her supervisor that she and Appellant

were seeking assistance through the Family Advocacy Program (FAP) to dissuade her leadership from intervening. MR would miss work because of the fights, and Appellant and MR agreed to use FAP appointments to explain why she was not at work.

On 11 April 2023, MR again recorded a video of her and Appellant arguing in their home, which was admitted at trial. Appellant was telling MR to get out of the house, or he was going to go on a "rampage" and destroy her personal belongings. During the trial, MR explained that during that week, Appellant destroyed her property. He "[d]umped it. Cut it. Shredded it." On 12 and 13 April 2023, MR said Appellant "bang[ed] [her cell phone] on the metal bed frame" until "it was completely shattered, in[side] and out[side]." On those same days, MR stayed home from work due to a rib injury she believed she suffered when Appellant was on top of her and they both heard a "snap." She was in significant pain and did not believe she could work. Text messages admitted at trial corroborated MR's concern about her rib and her request for Appellant to help her seek medical treatment.

MR described a series of violent events on 14 April 2023 throughout the house and garage. Appellant had "thrown [MR] around a little bit . . . ." Appellant ripped one of MR's sweaters he found in the laundry room. Appellant locked MR in the garage. Appellant had duct-taped the lock of one door and ratchet-strapped the second front door to the house to keep MR from getting back inside. Appellant grabbed her arm to throw her outside, after she managed to get inside the house. Appellant threatened to damage more of her personal belongings and went upstairs to the second floor of the house. MR followed him to try and prevent him from damaging her things, and Appellant threw MR on the floor. MR got up and Appellant threatened to kill MR. Appellant grabbed MR by the neck, using both his hands, and then he "puts a lot of force into it." Appellant said, "I have to kill you, [MR]. It's the only way." MR thought to herself, "okay, maybe this is where it ends for me." The doorbell rang. Appellant threw MR into the next room and told her to answer the door. That is when MR's supervisor, first sergeant, and Appellant's unit members had arrived to check on them.

Photographs taken at the hospital of MR's body on 14 April 2023 were admitted at trial and demonstrated significant and extensive bruising all over her body, including her neck and chin. Additional photographs taken at the residence on 14 April 2023 were admitted in trial and demonstrated damage to MR's cell phone and personal belongings.

A forensic pathologist testified for the Defense and said that she could not rule out self-harm or accidental injury as a source of MR's injuries. An officer

in the medical group also testified for the Defense stating that in her opinion, MR is not a truthful person.

In its rebuttal case, the Government called a forensic pathologist to testify. Disagreeing with the Defense's forensic pathologist, the Government's expert testified the pictures of MR's neck clearly showed evidence of strangulation and the injuries, in her opinion, were not self-inflicted.

### 2. Law

#### a. Standards of Review

We review questions of legal sufficiency de novo. *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). We review questions of factual sufficiency when an appellant asserts an assignment of error and shows a specific deficiency in proof. *United States v. Harvey*, 85 M.J.127, 129 (C.A.A.F. 2024) (citing Article 66(d)(1)(B)(i), UCMJ, 10 U.S.C. § 866(d)(1)(B)(i)).

#### b. Legal and Factual Sufficiency

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

Article 66(d)(1), UCMJ, provides:

> (B) FACTUAL SUFFICIENCY REVIEW.
>
>> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.

(ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

(I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

(II) appropriate deference to findings of fact entered into the record by the military judge.

(iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*). The factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is for an offense occurring on or after 1 January 2021. *See* The National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 542(e)(2), 134 Stat. 3388, 3612–13 (1 Jan. 2021).

The requirement of "appropriate deference" when a CCA weighs the evidence and determines controverted questions of fact "depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130. This court has discretion to determine what level of deference is appropriate. *Id.* at 131. "[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* (internal quotation marks omitted). In order for this court "to be clearly convinced that the finding of guilty was against the weight of the evidence, two requirements must be met." *Id.* at 132. "First, [we] must decide that the evidence, as [we] weighed it, does not prove that the appellant is guilty beyond a reasonable doubt. Second, [we] must be clearly convinced of the correctness of this decision." *Id.* (emphasis omitted). "[T]he factfinder at the trial level is always in the best position to determine the credibility of a witness." *United States v. Peterson*, 48 M.J. 81, 83 (C.A.A.F. 1998).

### c. Offenses

In order to convict Appellant of domestic violence by strangulation of MR as charged in Specification 1 of the Charge, the Government was required to prove that at or near Minot Air Force Base, North Dakota, on or about 14 April 2023: (1) Appellant assaulted MR, the intimate partner of Appellant; (2) Appellant did so by unlawfully strangling MR with his hands; and (3) that the

strangulation was done with unlawful force or violence. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), App. 2, at A2-45–46; *see also* Exec. Order. No. 14,062, 87 Fed. Reg. 4763, 4778 (31 Jan. 2022).[10] The term "'strangulation' means intentionally, knowingly, or recklessly impeding the normal breathing or circulation of blood of a person by applying pressure to the throat or neck, regardless of whether that conduct results in any visible injury or whether there is any intent to kill or protractedly injure the victim." 87 Fed. Reg. at 4772.

In order to convict Appellant of domestic violence by commission of a violent offense against MR as charged in Specification 4 of the Charge, the Government was required to prove that at or near Minot Air Force Base, North Dakota, between on or about 1 May 2022 and on or about 14 April 2023, on divers occasions: (1) Appellant committed a violent offense, to wit: assault consummated by battery by kicking MR's legs with his feet; and (2) that the violent offense was committed against MR who was, at the time of the violent offense, an intimate partner of Appellant. *MCM*, App. 2, at A2-45–46; Exec. Order. No. 14,062, 87 Fed Reg. at 4779. The term "violent offense" includes a violation of Article 128, UCMJ, 10 U.S.C. § 928, assault consummated by a battery. 87 Fed. Reg. at 4780.

In order to convict Appellant of domestic violence by commission of a violent offense against MR as charged in Specification 5 of the Charge, the Government was required to prove that at or near Minot Air Force Base, North Dakota, between on or about 1 May 2022 and on or about 14 April 2023, on divers occasions: (1) Appellant committed a violent offense, to wit: assault consummated by battery by punching MR's arms and torso with his fists; and (2) that the violent offense was committed against MR who was, at the time of the violent offense, an intimate partner of Appellant. *MCM*, App. 2, at A2-45–46; 87 Fed. Reg. at 4778. The term "violent offense" includes a violation of Article 128, UCMJ, assault consummated by a battery. 87 Fed. Reg.at 4780.

To convict Appellant of domestic violence by commission of a violent offense against MR as charged in Specifications 4 and 5 of the Charge, the Government was also required to prove each underlying offense of assault consummated by a battery, in violation of Article 128, UCMJ. Specifically, taken together, the Government was required to prove that at or near Minot Air Force Base, North Dakota, between on or about 1 May 2022 and on or about 14 April 2023, on divers occasions: (1) Appellant did bodily harm to MR by kicking her legs with

---

[10] This executive order established the elements and definitions for domestic violence, now found in the 2024 *MCM*, pt. IV, ¶ 78a.

his feet, and by punching her arms and torso with his fists; (2) that the bodily harm was done unlawfully; and (3) that the bodily harm was done with force or violence. *MCM*, pt. IV, ¶ 77.b.(2)(a)–(c).

In order to convict Appellant of domestic violence by commission of an offense against property with the intent to threaten or intimidate MR as charged in Specification 7 of the Charge, the Government was required to prove that at or near Minot Air Force Base, North Dakota, on or about 12 April 2023: (1) Appellant committed an act in violation of the UCMJ, to wit: destroying non-military property in violation of Article 109, UCMJ, 10 U.S.C. § 909; (2) that Appellant committed the act against a cellular device, the property of MR; and (3) that Appellant committed the act with the intent to threaten and intimidate the intimate partner, MR, of the Appellant. *MCM*, App. 2, at A2-45–46; 87 Fed. Reg. at 4778–79.

In order to convict Appellant of domestic violence by commission of an offense against property with the intent to threaten or intimidate MR as charged in Specification 8 of the Charge, the Government was required to prove that at or near Minot Air Force Base, North Dakota, between on or about 1 December 2022 and on or about 14 April 2023, on divers occasions: (1) Appellant committed an act in violation of the UCMJ, to wit: destroying non-military property in violation of Article 109, UCMJ; (2) that Appellant committed the act against clothing, shoes, hair appliances, toiletries, bags, a cooler, makeup items, eyeglasses, and other household items, the property of MR; and (3) that Appellant committed the act with the intent to threaten and intimidate the intimate partner, MR, of the Appellant. *MCM*, App. 2, at A2-45–46; 87 Fed. Reg. at 4778–79.

In order to convict Appellant of domestic violence by commission of an offense against property with the intent to threaten or intimidate MR as charged in Specifications 7 and 8 of the Charge, the Government was also required to prove the underlying offenses of destroying non-military property, in violation of Article 109, UCMJ. Specifically, taken together, the Government was required to prove that at or near Minot Air Force Base, North Dakota, on or about 12 April 2023, and between on or about 1 December 2022 and on or about 14 April 2023 on divers occasions: (1) Appellant willfully and wrongfully destroyed the certain non-military property as alleged; (2) that the property belonged to MR; and (3) that the property was of some value. *MCM*, pt. IV, ¶ 45.b.(3)(a)–(c).

In order to convict Appellant of domestic violence by commission of an offense with the intent to threaten or intimidate MR as charged in Specification 9 of the Charge, the Government was required to prove that at or near Minot

Air Force Base, North Dakota, between on or about 1 December 2022 and on or about 14 April 2023, on divers occasions: (1) Appellant committed an act in violation of the UCMJ, to wit: communicating a threat in violation of Article 115, UCMJ, 10 U.S.C. § 915; (2) that Appellant committed the act against MR; and (3) that Appellant committed the act with the intent to threaten and intimidate the intimate partner, MR, of the Appellant. *MCM*, App. 2, at A2-45–46; 87 Fed. Reg.at 4778.

To convict Appellant of domestic violence by commission of an offense with intent to threaten or intimidate MR as charged in Specification 9 of the Charge, the Government was also required to prove the underlying offense of communicating a threat in violation of Article 115, UCMJ. Specifically, that at or near Minot Air Force Base, North Dakota, between on or about 1 December 2022 and on or about 14 April 2023, on divers occasions: (1) Appellant communicated certain language, to wit: "I'm going to have to kill you" and "I'm going to blow your brains out," or words to that effect, expressing a present determination or intent to injure MR, presently or in the future; (2) that the communication was made known to MR; and (3) the communication was wrongful. *MCM*, pt. IV, ¶ 53.b.(1)(a)–(c). A communication is "wrongful" if Appellant transmitted it "for the purpose of issuing a threat or with the knowledge that the communication would be viewed as a threat." *MCM*, pt. IV, ¶ 53.c.(2).

### 3. Analysis

#### a. Strangulation

Regarding the factual sufficiency of domestic violence by strangulation, Appellant has made a request for a factual sufficiency review and has asserted a showing of a deficiency of proof in that MR is not credible, primarily that she is untruthful. This is the same deficiency Appellant alleges for every conviction. We have considered whether Appellant's claims are specific enough to trigger further analysis. We decide Appellant's claims of deficiency is sufficiently specific for our analysis of this offense, as well as the other offenses.

We find Appellant's conviction for domestic violence by strangulation committed against MR, his intimate partner, factually sufficient. MR testified that on 14 February 2023, Appellant used his two hands, grabbed her neck, and used force on her neck. Photographs taken on 14 February 2023 demonstrate bruises and other marks along both sides of her neck. Appellant submits the marks could have been self-inflicted. While this argument is supported by a defense expert at trial offering that she could not rule out self-inflicted harm, the testimony was opposed by a government expert who opined the injuries on MR's neck were not self-inflicted. The weight of the evidence is that Appellant committed domestic violence by strangulation.

After weighing all the evidence and having given appropriate deference to the fact that the panel members saw and heard the witnesses, this court does not conclude that the findings of guilty were against the weight of the evidence as to Specification 1 of the Charge. Thus, those findings of guilty are factually sufficient. *See* Article 66(d)(1)(B)(i)–(ii), UCMJ (2024 *MCM*).

### b. Kicking Legs and Punching Arms and Torso

Viewing the evidence in the light most favorable to the Government, the panel members rationally found Appellant guilty of domestic violence by commission of violent offenses, including the underlying offenses of assault consummated by a battery of MR, his intimate partner, beyond a reasonable doubt. Therefore, the findings of guilty as to Specifications 4 and 5 of the Charge, and to the Charge are legally sufficient. *See Robinson*, 77 M.J. at 297–98.

We find Appellant's convictions for domestic violence by commission of violent offenses, including the underlying assaults consummated by batteries of MR are factually sufficient. MR testified that on multiple occasions, between May 2022 and April 2023, Appellant kicked her legs with his feet and punched her arms and body with his fists. She recorded her injuries with photographs and videos, which were admitted at trial. On 14 April 2023, numerous photographs were taken of her body which clearly demonstrate extensive bruising, in various stages of healing, on her arms, torso, and legs. According to the testimony of both the defense and government experts, neither believed these extensive injuries were caused by self-harm.

After weighing all the evidence and having given appropriate deference to the fact that the panel members saw and heard the witnesses, this court does not conclude that the findings of guilty were against the weight of the evidence as to Specifications 4 and 5 of the Charge, and to the Charge. Thus, those findings of guilty are factually sufficient. *See* Article 66(d)(1)(B)(i)–(ii), UCMJ (2024 *MCM*).

### c. Destroying Non-Military Property

Viewing the evidence in the light most favorable to the Government, the panel members rationally found Appellant guilty of domestic violence by commission of an offense against property, including the underlying offenses of damaging MR's non-military property, beyond a reasonable doubt. Therefore, the findings of guilty as to Specifications 7 and 8 of the Charge, and to the Charge are legally sufficient. *See Robinson*, 77 M.J. at 297–98.

We find Appellant's convictions for domestic violence by commission of an offense against MR's non-military property, as charged in Specifications 7

(cellular device) and 8 (clothing, shoes, hair appliances, toiletries, bags, a cooler, makeup items, eyeglasses, and other household items) are factually sufficient. MR testified that on 12 April 2023, Appellant banged MR's cellular device against the metal frame of their bed multiple times, until it was no longer functional. A photograph admitted at trial corroborates the damage to the cellular device. Appellant complains that MR is not credible, and not truthful, and therefore cannot be believed. We find MR credible. She explained how and why Appellant destroyed her cellular device. As for every nontruth, MR provided a plausible explanation as to why she may have intentionally lied, or whether she was confused. Similarly, we find MR was not incentivized to destroy her own personal belongings on divers occasions between 1 December 2022 and 14 April 2023. In addition to MR's testimony that Appellant damaged her personal belongings, she recorded him in the act. Appellant specifically stated he was destroying her property, and would continue to do so, while being recorded damaging her personal belongings. On 14 April 2023, numerous photographs were taken by law enforcement of their shared residence, and damage can be seen to the items charged.

After weighing all the evidence and having given appropriate deference to the fact that the panel members saw and heard the witnesses, this court does not conclude that the findings of guilty were against the weight of the evidence as to Specifications 7 and 8 of the Charge, and to the Charge. Thus, those findings of guilty are factually sufficient. *See* Article 66(d)(1)(B)(i)–(ii), UCMJ (2024 *MCM*).

### d. Communicating a Threat

Viewing the evidence in the light most favorable to the Government, the panel members rationally found Appellant guilty of domestic violence by communicating a threat against MR, his intimate partner, with intent to threaten and intimidate MR beyond a reasonable doubt. Therefore, the findings of guilty as to Specification 9, and to the Charge are legally sufficient. *See Robinson*, 77 M.J. at 297–98.

We find Appellant's conviction for domestic violence by communication of a threat is factually sufficient. MR testified that on numerous occasions, including 14 April 2023, Appellant threatened to kill her by using the words, "I'm going to have to kill you," and "I'm going to blow your brains out," or words to that effect. MR testified that these words, combined with Appellant's hands on her neck, applying force, on 14 April 2023, brought her to believe she was not going to survive the day. We find MR credible. These words combined with his actions indicate Appellant's intent to threaten and intimidate MR and convey his intent to injure her.

After weighing all the evidence and having given appropriate deference to the fact that the panel members saw and heard the witnesses, this court does not conclude that the findings of guilty were against the weight of the evidence to Specification 9 of the Charge, and to the Charge. Thus, those findings of guilty are factually sufficient. *See* Article 66(d)(1)(B)(i)–(ii), UCMJ (2024 *MCM*).

We therefore conclude that Specifications 1, 4–5, and 7–9 of the Charge and the Charge are factually and legally sufficient.

### C. Prosecutorial Misconduct: Argument

Appellant complains for the first time that trial counsel made several improper arguments at trial. His brief raises three categories of alleged improper argument, including: expressing personal beliefs and opinions, to include vouching; disparaging opposing counsel; and commenting on Appellant's right to not testify. Appellant further advocates that the cumulative impact of all three categories of error result in prejudicing Appellant's substantial rights.

#### 1. Law

"Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citations omitted). A prosecutor's interest "in a criminal prosecution is not that [the Government] shall win a case, but that justice shall be done." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

We review prosecutorial misconduct and improper argument de novo. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). When no objection is made at trial, we review for plain error. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (footnote and citation omitted). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id.* at 401 (quoting *Fletcher*, 62 M.J. at 179).

"[A]rgument by a trial counsel must be viewed within the context of the entire court-martial. The focus of [the] inquiry should not be on words in isolation, but on the argument as 'viewed in context.'" *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (quoting *United States v. Young*, 470 U.S. 1, 16 (1985)) (additional citations omitted). In performing our review, "it is improper to 'surgically carve' out a portion of the argument with no regard to its context." *Id.*

> Appellate judges must exercise care in determining whether a trial counsel's statement is improper or has improper connotations. The [United States] Supreme Court has emphasized that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."

*United States v. Palacios Cueto*, 82 M.J. 323, 333 (C.A.A.F. 2022) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)). Thus, "[a] statement that might appear improper if viewed in isolation may not be improper when viewed in context." *Id.* (citing *Donnelly*, 416 U.S. at 645).

If we find a prosecutor's argument "amounted to clear, obvious error," we then determine "whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Voorhees*, 79 M.J. at 9 (internal quotation marks and citations omitted). "For constitutional errors, rather than the probability that the outcome would have been different, courts must be confident that there was *no reasonable probability* that the error *might have contributed* to the conviction." *United States v. Tovarchavez*, 78 M.J. 458, 462 n.5 (C.A.A.F. 2019) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). That is, "where a forfeited constitutional error was clear or obvious, 'material prejudice' is assessed using the 'harmless beyond a reasonable doubt' standard set out in [*Chapman*]." *Id.* at 460 (quoting *United States v. Jones*, 78 M.J. 37, 45 (C.A.A.F. 2018)). In analyzing prejudice from a prosecutor's improper argument, we consider: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184).

"Absent evidence to the contrary, [we] may presume that members follow a military judge's instructions." *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted).

"[T]he lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

In a plain error analysis, the most straightforward way of resolving an allegation of prosecutorial misconduct may be to do so based on prejudice or lack thereof. *Palacios Cueto,* 82 M.J. at 335.

**2. Analysis**

Appellant offers three categories of alleged trial counsel improper argument, claiming one of the categories includes comments upon Appellant's lawful exercise of his constitutional right not to testify. All three categories of alleged improper argument stem from examples of those made in *Fletcher*. *See* 62 M.J. 175. We do not see the correlation to *Fletcher*. We also do not see any trial counsel comment or argument that could be remotely considered as implicating Appellant's constitutional rights.

We review for plain error and find no clear or obvious error. *Andrews*, 77 M.J. at 398. But if any comment or argument rises to a level of plain error, we do not find prejudice. Specifically, we find there is no reasonable probability that, but for the error, the outcome of the proceeding would have been different. *Voorhees*, 79 M.J. at 9. And if any error is deemed constitutional error, we are confident that there is no reasonable probability that the error might have contributed to the conviction. *Tovarchavez*, 78 M.J. at 462 n.5.

First, Appellant submits trial counsel vouched for MR by his frequent use of the words "we" and "we know." Taken in context, these words were not used by trial counsel to demonstrate "personal assurances" about MR, or any other witness, or evidence. *Fletcher*, 62 M.J. at 180. Instead, trial counsel was often referring to the collective understanding of the witness testimony and evidence properly admitted in trial, from the perspective of the government counsel. Appellant provides additional examples of what he characterizes as personal commentary on the evidence; however, in context no additional analysis is warranted here.

Second, Appellant submits that trial counsel infringed upon Appellant's right not to testify, when trial counsel pointed out to the members that the Defense had proffered evidence of MR committing self-harm would be admitted at trial, when it was not. We do not view trial counsel's comments regarding the evidence trial defense counsel asserted would be admitted, as nearing the infringement of Appellant's constitutional right to not testify in his own defense. Appellant creates the nexus to a constitutional infringement by assertion, suggesting that only Appellant could be the source of evidence of MR's self-harm to complete this argument of prosecutorial misconduct. However, Appellant's trial defense counsel confronted MR, as well as the experts, on the viability of self-harm as a source of various injuries. "It is well established that the [G]overnment may comment on the failure of a defendant to refute government evidence or to support his own claims." *United States v. Webb*, 38 M.J. 62, 66 (C.M.A. 1993) (quoting *United States v. Coven*, 662 F.2d 162, 171 (1981)).

Third, Appellant contends trial counsel improperly disparaged trial defense counsel and the Defense more generally. For example, Appellant cites portions

of the rebuttal argument where trial counsel described the trial defense counsel's arguments as "silly," described them as offering a "spin" that "ignores almost all of the evidence in this case," suggested they were "gaslight[ing]" MR, and asked the panel members to "not let [the Defense] continue to do what [Appellant] has done to [MR] for 2 years." In *Voorhees*, the United States Court of Appeals for the Armed Forces (CAAF) held that the trial counsel clearly and obviously erred when he "maligned" the trial defense counsel and "made the defense theory of the case seem fantastical." 79 M.J. at 10 (citation omitted). Assuming for purposes of analysis that trial counsel's characterization of the defense argument was clear error, we nevertheless find no reasonable probability that it affected the outcome. *See id.* at 9. First, the severity of any error was low; the comments were relatively limited and were part of a larger argument that primarily focused on the evidence. *Cf. Gilley*, 56 M.J. at 123 (explaining the absence of objection is some indication of minimal impact). Second, the trial judge *sua sponte* provided significant additional limiting instruction following trial counsel's rebuttal, to the effect that they should disregard counsel's personal opinions.[11] Third, the evidence supporting the convictions was moderately strong. Accordingly, we are confident that the members convicted Appellant on the basis of the evidence alone. *See Andrews*, 77 M.J. at 403 (quoting *Fletcher*, 62 M.J. at 184); *see also United States v. Matti*, __ M.J. __, No. 25-0148, 2026 CAAF LEXIS 189, at *22 (C.A.A.F. 17 Feb. 2026) (holding that the trial counsel's improper statements during closing arguments "did not cause material prejudice and therefore were not plain error").

We find no error amounting to prosecutorial misconduct through argument. But if there is error, we find no prejudice because the severity of misconduct is low and the strength of the evidence is high. *Palacios Cueto,* 82 M.J. at 335.

**D. Docketing and Appellate Review Delay**

**1. Additional Background**

The court members sentenced Appellant on 16 December 2023, and the trial judge entered the judgment on 2 February 2024. Before docketing, the Air

---

[11] The trial judge instructed the panel members as follows:

> If you believe that you heard either counsel express their personal opinion about a witness's character or the strength of the evidence, you may not consider it for that purpose. Counsel are not permitted to offer personal opinions; that was merely argument. Neither counsel's personal opinions, personal qualifications, or personal conduct in court are matters relevant for your consideration in resolving the matters before you. You, and you alone, determine the credibility of the witnesses and whether the [G]overnment has proven the elements of an offense beyond a reasonable doubt.

Force Appellate Records Branch returned the record of trial on 25 April 2024 for correction by the trial judge to Appellate Exhibit XXXI. The correction was made and certified by the trial judge on 16 May 2024. The record of trial was docketed with this court on 5 June 2024. Thereafter, Appellant requested and was granted 12 enlargements of time before filing his assignments of error on 8 September 2025. The Government filed its answer brief on 28 October 2025, after obtaining one enlargement of time; Appellant filed a reply to the Government's answer on 9 November 2025.

### 2. Law

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay "where the action of the convening authority is not taken within 120 days of the completion of trial," "where the record of trial is not docketed by the [CCA] within thirty days of the convening authority's action," or "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the [CCA]." 63 M.J. at 142. In *United States v. Livak*, this court adapted the *Moreno* standard for cases referred to trial on or after 1 January 2019 and established an aggregated 150-day standard for facially unreasonable delay from sentencing to docketing with the CCA. 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020).

Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of the right to timely post-trial review: (1) oppressive incarceration; (2) "particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

We review de novo an appellant's entitlement to relief for post-trial delay. *Livak*, 80 M.J. at 633 (citing *Moreno*, 63 M.J. at 135).

### 3. Analysis

#### a. Docketing Delay

The record of trial was docketed with this court 172 days after sentencing, exceeding the 150-day *Livak* standard for facially unreasonable delay. Accordingly, we have considered the *Barker* factors, and under the circumstances of this case, we find no violation of Appellant's due process rights.

We note the record of trial in this case is voluminous, including 111 total exhibits and over 1,200 pages of transcript. According to the court reporter chronology and the base paralegal's declaration, the Government displayed diligence when creating the record of trial. Further, the Government displayed responsiveness once an error was identified with Appellate Exhibit XXXI. From the date the record was returned for correction to that Appellate Exhibit (25 April 2024), through the date the trial judge signed the certificate of correction (16 May 2024), 21 days elapsed. The length of delay and the reasons for the delay are reasonable and favor the Government.

Appellant requested "speedy post-trial processing" in his post-trial submission of matters to the convening authority on 26 December 2023. Requesting speedy post-trial processing at the time of submitting matters to a convening authority is reasonable; this factor weighs slightly in Appellant's favor. Finally, Appellant has not suffered prejudice. Appellant proclaims that if his case was docketed more promptly, his case would have been reviewed more quickly. However, this is not cognizable prejudice from the delay in docketing with this court.

Absent prejudice, we find the post-trial delay involved in Appellant's case has not been so egregious as to adversely affect the perception of the military justice system. *See Toohey*, 63 M.J. at 362. Furthermore, recognizing our authority under Article 66(d)(2), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Valentin-Andino*, 85 M.J. 361, 366 n.4 (C.A.A.F. 2025). We conclude such relief is not warranted.

#### b. Appellate Review Delay

Over 18 months have elapsed since Appellant's record of trial was originally docketed with the court. Therefore, under *Moreno* there is a facially unreasonable delay; we note the 18-month threshold has been exceeded by just over 120 days. Accordingly, we have again considered the *Barker* factors and find no due process violation. Appellant has not specifically alleged cognizable prejudice from appellate delay. For the reasons stated above with respect to the docketing delay, we find no cognizable prejudice. Absent prejudice, we

similarly find the post-docketing delay involved in Appellant's case has not been so egregious as to adversely affect the perception of the military justice system. Most of the delay was the result of defense requests for 12 enlargements of time in which to file the assignments of error. In addition, we have considered the large size of the record and the number and complexity of the issues Appellant raised. Accordingly, we find no egregious delay and no violation of Appellant's due process rights, *see Toohey*, 63 M.J. at 362; nor do we find any relief warranted in the absence of a due process violation under Article 66(d)(2), UCMJ.

## E. Petition for a New Trial

### 1. Additional Background

After Petitioner[12] and MR ended their romantic relationship, MR entered a new romantic relationship with a civilian, AF. As MR and AF's relationship eroded, AF recorded certain statements MR made and provided them to his mother, who provided them to Petitioner.[13] Through his appellate defense counsel, and through his Petition for a New Trial, Petitioner offers 12 edited recordings to assert newly discovered evidence, which he says challenges MR's credibility at Petitioner's trial.

Notably, MR's statements in the recordings demonstrate she may be contemplating making false allegations of domestic violence against AF. For example, in one recording MR tells AF she "is going to set it up so that way it's going to look like you hit me and I'm going to call the cops and it's going to get really ugly really quick because that's what you deserve for f[**]king with me bro." In another recording, MR explains that she will have her brother "pinch the f[**]k out of" her, and then she will call the police and accuse AF of hitting her. In an additional recording, she briefly compares AF to Petitioner,

---

[12] We refer to Appellant as Petitioner for this issue because he filed a Petition for a New Trial separately on 23 January 2026 from his brief for our Article 66, UCMJ, review; and the court docketed it this same date under Misc. Dkt. No. 2026-02.

[13] In addition to the recordings, Appellant provides three declarations. The first declaration is from AF's mother, who explains how she came to possess the recordings, and how she was able to contact Petitioner's appellate defense counsel. The second declaration is from AF. AF explains he began to record his conversations with MR because of her false allegations. He states the recordings began in May 2024 and continued through 2025, without specifying a timeframe within 2025. The third declaration is from an Air Force defense paralegal who assisted in an interview with MR's first husband.

suggesting both men accused her of creating false accusations of crimes. She quips that Petitioner was actually convicted of domestic violence.[14]

### 2. Law

A petitioner may petition for a new trial "on the grounds of newly discovered evidence or fraud on the court." Article 73, UCMJ, 10 U.S.C. § 873. A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:

> (A) The evidence was discovered after the trial;
>
> (B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and
>
> (C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

R.C.M. 1210(f)(2) (2024 *MCM*); *see United States v. Luke*, 69 M.J. 309, 314 (C.A.A.F. 2011); *United States v. Johnson*, 61 M.J. 195, 198 (C.A.A.F. 2005). "[R]equests for a new trial . . . are generally disfavored," and are "granted only if a manifest injustice would result absent a new trial . . . based on proffered newly discovered evidence." *United States v. Hull*, 70 M.J. 145, 152 (C.A.A.F. 2011) (quoting *United States v. Williams*, 37 M.J. 352, 356 (C.M.A. 1993)).

### 3. Analysis

Petitioner asserts the 12 recordings constitute newly discovered evidence that warrants a new trial pursuant to Article 73, UCMJ. Petitioner suggests this new evidence demonstrates MR's capability to fabricate false claims of domestic violence. Petitioner further argues that this evidence, coupled with the excluded evidence under Mil. R. Evid. 608(c), clearly shows that MR has a "habit, common plan or scheme, and modus operandi of lying about and fabricating domestic violence allegations as seen before, during, and after [Petitioner's] court-martial." Petitioner asserts that "if considered by the court-martial in the light of all other pertinent evidence, [the new evidence] would probably produce a substantially more favorable result for [Petitioner]." We find

---

[14] Specifically, AF confronts MR about threatening him through alleging false crimes against MR. AF states, "[you are] trying to falsely . . . accuse me of a crime." MR responds, "That's what—that's crazy cause [sic] that's exactly what [Petitioner] was saying, only for him to be found guilty of the crime."

Petitioner has failed to meet his burden to demonstrate a new trial is necessary to avoid a manifest injustice.

We accept that the newly discovered evidence was discovered after trial. We further accept that the evidence is not such that it would have been discovered by the Petitioner at the time of trial in the exercise of due diligence. This, of course, is because the recordings were created after Petitioner's 16 December 2023 trial.

However, we conclude Petitioner has failed to demonstrate the recordings of MR, "if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result" for Petitioner. We reach this conclusion for numerous reasons, and we highlight the most significant three below.

First, MR's recorded statements are made in emotional arguments with AF. AF is the target of her threats to fabricate allegations of domestic violence. Neither the recordings, nor the declarations, provide information that MR actually fabricated evidence, alleging any crime, against AF. Furthermore, MR does not indicate she testified falsely or otherwise fabricated evidence against Petitioner before or during Petitioner's court-martial.

Second, even if determined relevant, any probative value of these recordings "is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." Mil. R. Evid. 403.

Third, as discussed *supra*, MR's credibility was attacked thoroughly at trial. MR denied suggestions that she fabricated the allegations against Petitioner and that her injuries were self-induced, accidental, or came from other sources. A witness testified that MR was an untruthful person. MR admitted that she had lied about her age. Nonetheless, substantial evidence was presented at trial which corroborated MR's allegations. Indeed, MR did not intend to initiate a complaint against Petitioner for domestic violence. Instead, she was encouraged to be medically evaluated upon the responders witnessing significant bruising on MR's legs.

Petitioner invites us to evaluate various theories of admissibility for the newly discovered evidence including Mil. R. Evid. 404(b), Mil. R. Evid. 406, and Mil. R. Evid. 608(c), but we need not as we do not believe the recordings survive the Mil. R. Evid. 403 balancing tests. Therefore, Petitioner has failed to demonstrate that the newly discovered evidence requires a new trial to avoid manifest injustice.

## III. CONCLUSION

Appellant's Petition for a New Trial, dated 23 January 2026, is **DENIED**.

As entered, the findings are correct in law and fact. Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2024 *MCM*). In addition, the sentence as entered is corrected in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court